## NEWCOMB v. SMITH.

<div style="float:right">2p 131<br>74 630<br>74 631</div>

1. MILL-DAM LAW—CONSTITUTIONAL LAW.—The act of the territory relating to mills and mill-dams, of January 13, 1840, is not in violation of the constitution, nor of the ordinance of 1787. STOW, C. J., and LARRABEE, J., *dissenting*.

2. The erection of mill-dams or other works for public convenience, though it may interfere with or injure private rights, is within the power of the legislature, and the party aggrieved can only have such remedy as the statute prescribes.*

(1 *Chand.* 71.)

ERROR to the Circuit Court for *Washington* County.

This was a complaint instituted by *Newcomb* against *Smith*, under and in accordance with the statute of the territorial legislature of Wisconsin, relating to mill-dams, passed January 13, 1840, whereby the complainant alleged that he had sustained damages upon lands and premises belonging to him, and injuriously affected by the erection of a dam by defendant, which caused the flooding of his land, and he prayed for an assessment of the damages he had sustained, by a jury. Various subsequent pleadings were interposed by the parties, but which were all withdrawn, and at the September term of the circuit court, the defendant filed a motion to dismiss the complaint and proceedings of the complainant, for the reason " that the act of the legislative assembly upon which the proceedings in this case are based, is unconstitutional and void, the same being in contravention of the constitution of the United States, the ordinance of 1787, and the constitution of Wisconsin."

The motion to dismiss the complaint was sustained, and the complaint was dismissed, and the plaintiff brought a writ of error.

*James S. Brown*, for plaintiff in error.

*James Holliday*, for defendant in error.

HUBBELL, J.   If the act of 1840, under which this complaint was brought, is not in conflict with the constitution of the United States, or the ordinance of 1787, the judgment of the court below must be reversed.

The overflowing of the land of the plaintiff in error, by reason of the dam of defendant in error, is not denied, but the owner of the dam contends that he is prosecuted for the damage done, in an irregular manner; that he ought to have been proceeded against by writ and pleadings at common law, and not by complaint under the statute.   It would be right, I think, to tell the plaintiff in error he must define his position.   If the law of 1840 is unconstitutional, he has no justification for raising a dam and overflowing his neighbor's lands; and on his own showing he comes into court a trespasser, and is not entitled to be heard.   If, on the contrary, that law is valid, the proceedings against him were regular, and he has no ground to complain.   But as the question involved in this case is one of wide-spread interest, and public confidence may be unsettled until the main point shall be decided by this court, I will proceed to its examination with as much brevity as possible.

It never could be urged against the people of the United States or their ancestors in England, that they did not maintain a sacred regard for the rights of private property. More than six hundred years ago it was declared in Magna Charta, chapter 29, " That no freeman should be disseized of his freehold but by the law of the land."   Lord COKE expounds " the law of the land " to mean " due process of law." The constitution of the United States adopts the language of

Lord COKE, and also adds (sec. 5, Amendments) : " Nor shall private property be taken for public use, without just compensation." The same provisions are incorporated into the constitutions of New York and several other states of the Union.

The ordinance of 1787, which was the fundamental law of Wisconsin at the time the present suit was commenced, declares that "no man shall be deprived of his liberty or property but by the judgment of his peers or the law of the land." But for these wise restraints upon legislative power, the right of government, as a sovereign authority, to take the property of individuals for public use, would be absolute ; and that, too, without even allowing any direct compensation. See 5 Term. 794 ; 1 Nott & McCord, 387 ; Vattel, Book 1, ch. 9, § 103.

The right to appropriate private property for *private* use has been deemed to be precluded by the provision authorizing it to be taken for *public* use, only upon just compensation. The main question in the present case is, whether the land overflowed by reason of the mill-dam erected by the defendant in error, was taken for public use. A preliminary question is raised, whether the proceeding by complaint under the statute is by " due process of law," and " according to the course of the common law."

The act of the territorial legislature, approved January 13, 1840, contains the following provisions :

SEC. 1. Any person may erect and maintain a water-mill and a dam to raise water for working it, upon and across any stream that is not navigable, upon the terms and conditions, and subject to the regulations hereinafter expressed.

SEC. 2. No such dam shall be erected to the injury of any mill lawfully existing either above or below it, on the same stream, nor to the injury of any mill-site on the same stream on which a mill or mill-dam shall have been lawfully erected and used or is in the process of erection, unless the right to

maintain a mill on such last mentioned site shall have been lost or defeated by abandonment or otherwise ; nor shall any mill or dam be placed on the land of any person, without such grant, conveyance or authority from the owner as would be necessary by the common law, if no provisions relating to mills had been made by the statute.

SEC. 3. The height to which the water may be raised, and the length or period of time for which it may be kept up in each year, shall be liable to be restricted and regulated by the verdict of a jury, as hereinafter provided.

SEC. 4. Any person whose land is overflowed, or otherwise injured by such dam, may obtain compensation therefor upon his complaint before the district court for the county where the land lies, etc.

The subsequent sections prescribe the mode of proceeding and estimating the damages, by a trial by jury, and judgment of the court. The jury are directed to find the annual damage and also the gross amount of damage ; and the complainant may elect between them, and may also have a new assessment at the end of every ten years. Section 28 is as follows : " No action shall be sustained at common law, for the recovery of damages, for the erecting, maintaining or using any mill or mill-dam, except as provided in this act."

This act technically takes away the right to sue " at common law." The ordinance of '87 declares that the inhabitants of the northwest territory shall be entitled to "judicial proceedings, according to the course of the common law," while the constitution of the United States, as we have seen, prohibits the taking of private property except by " due course of law." It is contended that the complaint authorized by the statute is in derogation of this common right of the citizens of Wisconsin ; that they are subject only to process known to the common law. If this were admitted, the rights of our people would be dependent upon mere matters of form ; very many of our legal proceedings, such as suits

in equity, references out of court, adjudications by judges of probate, etc., would be fatally erroneous. The defendant in error would be driven back to the *original writ*, which became obsolete in practice before the present century. In general, "due process of law" has been construed to mean a legal proceeding under the direction of a court. If there had been a trial by jury, "a judgment of peers," in the language of the older writers, the question of regularity has never before been raised on constitutional grounds. Indeed, if we look into the practice of the several states of the Union, as well as of the British parliament, there will be found a wide departure from even this original understanding of the rule. As early as 1796, in the state of New York, by a legislative act, the property of private persons was authorized to be taken on an assessment of damages by commissioners. See *the act in relation to the Albany water works*. And the same or like modes of assessment have been adopted and sanctioned, after great discussion and consideration of the subject, in almost all the states. See cases cited in *Beekman v. Saratoga & S. R. R. Co.*, 3 Paige, 45. Were we now to declare this law unconstitutional, on the ground that it authorizes a judicial proceeding not "according to the course of the common law," we should run counter to the decisions of courts, of legislatures and constitutional conventions for the last half century. It is enough to know that the substantial rights of the party are protected by forms prescribed by law.

It remains to be seen whether the act can be sustained under the other branch of inquiry. Is the appropriation of land for the use of water-mills, in any right sense, a "public use?" To arrive at a correct conclusion on this subject, we must look at the acts and judicial decisions of other states. We should commit a great error if we assumed that public use is confined to such appropriations as the government may have occasion to make for the common defense and safety, when acting by its officers and agents in cases of emergency.

Such cases sometimes occur; but it far more frequently happens that the right to take private property for public use is exercised in a manner less direct for objects less general. "The utility of highways, canals, bridges, and, in a word, of all safe and commodious ways of communication (says Vattel) cannot be doubted. And hence, direct taxes and forced contributions for these purposes have been regarded as equally just and necessary in all civilized countries." Modern states, however, have found it more convenient to devolve upon private individuals and corporate bodies the exercise of this useful if not indispensable power. In New York, special agents have been made in a great variety of cases. The franchise has been granted to secure the improvement, and the public benefit is generally regarded as an equivalent for the franchise.

In some cases public tolls have been exacted, or specific burdens or duties imposed, though this has never been considered essential to the right. 3 Johns. Ch. 166 ; 4 Wend. 1 ; 3 Paige, 12 ; 18 Wend. 45.

The same principle may be pursued through the legislative acts and judicial proceedings of every state in the Union, and it will be found as diversified in its objects as in the modes and means of its application. In *Beekman v. the Saratoga & S. R. R. Co.*, *supra*, the subject was discussed with great learning and ability, and the doctrine laid down by Chancellor WALWORTH, in language so clear and appropriate, that I will quote it at length: "The right of eminent domain, however, does not imply a right in the sovereign power to take the property of one citizen and transfer it to another, even for a full compensation, where the public interest will be in no way promoted by such transfer. And if the legislature should attempt thus to transfer the property of one individual to another, where there can be no pretense of benefit to the public by such exchange, it would probably be a violation of the contract by which the land was granted by the

government to the individual, or to those under whom he claimed title, and repugnant to the constitution of the United States.    But, if the public interest can be in any way promoted by the taking of private property, it must rest in the wisdom of the legislature to determine whether the benefit to the public will be of sufficient importance to render it expedient for them to exercise the right of eminent domain, and to authorize an interference with the private rights of individuals for that purpose.    2 Kent's Com. 340.

It is upon this principle that the legislatures of several of the states have authorized the appropriation of the lands of individuals for mill-sites, where, from the nature of the country, such mill-sites could not be obtained for the accommodation of the inhabitants without overflowing the land thus appropriated.    Upon the same principle of public benefit, not only the agents of the government, but also individuals and corporate bodies have been authorized to take private property for the purpose of making public highways, turnpike roads and canals ;  of erecting and constructing wharves and basins ; of establishing ferries and draining swamps and marshes, and of bringing water to cities and villages.    In all such cases, the object of the legislative grant of power is the public benefit derived from the contemplated improvement, whether such improvement is to be effected directly by the agents of the government, or through the medium of corporate bodies or of individual enterprise.    And, according to the opinion of Chief Justice MARSHALL, in the case of *Wilson v. Black Bird Creek Marsh Co.*, 2 Pet. 251, measures calculated to produce such benefits to the public, though effected through the medium of a private incorporation, are undoubtedly within the powers reserved to the states."

It thus appears that the constitutionality of the right has never been measured by the precise amount or degree of the public benefit to be conferred.    Is there any good reason why water-mills should not be regarded as public improvements ?

Why the legislature should not favor their construction, especially in a new country, among a scattered population and where capital is limited ?   In the early history of New York, special acts were granted authorizing the owners of mills to overflow the lands of others, by dams.   See Kent and Radcliff's Laws, p. 49.   In Ohio, such acts have been more or less in operation for many years.   In New Hampshire and Maine similar laws are in existence, and in Massachusetts, from which our act is derived, for more than one hundred years its constitutionality has never been questioned, either by her enlightened courts or her sagacious and liberty-loving people. It seems to me a strong argument is derived from the concurrent opinions of the people of other states ; and if it might be assumed that in copying their statute laws we took also the decisions of their courts in respect to them, the authority would be almost conclusive.   The supreme court of the United States has repeatedly held that a cotemporary exposition of the constitution, adopted and acquiesced in for a period of years, fixes its construction.   1 Cranch, 299 ; 10 Wheat. 159.   The mill-dam law of Massachusetts has survived repeated revisions of her laws, and even changes of her constitution and revolutions in her government, and since its adoption in Wisconsin our people have passed from territorial dependency to state soverignty, and this law has not only been sanctioned by the direct action of territorial courts, but has received the tacit sanction of two constitutional conventions, never, I believe, charged with any disregard of private rights.   After all this ; after it has rested nine years unquestioned on our statute book ; after it has become alike the source and the guaranty of important vested interests, it would seem to me an inauspicious act of the new judiciary of the state to lead the way in pronouncing it unconstitutional and void from the beginning.

The objections to this law are addressed to the wrong tribunal.   They relate to its expediency and not to its constitu-

tionality. Wherever there is even an apparent public interest to sustain a public act, the legislature and not the court is the proper judge of its necessity. The question in all such cases. is not, whether the law is indispensable, but whether it may be useful and convenient. Railroads can, in no proper sense, be said to be indispensable ; neither can toll-bridges, water-works and many other works of improvement which more or less interfere with private rights. Streets and alleys in cities are oftentimes not only indispensable, but of even questionable utility. And yet the legislative power alone, or such subordinate person or body as it may designate to judge of their expediencey, has been permitted by common consent to act as the sole arbiter in extending them over private grounds. Never, unless in cases of palpable and wanton abuse of power, or when the evidence of a departure from the rule of public use is manifest on the face of the act, can the courts properly interpose and declare such acts void. I understand the cases cited in argument, from 11 Wend.; 19 id. 659 ; 5 Hill, to be precisely instances of this sort, and, therefore, authorities in favor of and not against the position here assumed. It is true that the learned courts of New York have closely swept the boundary line between the judicial and the legislative provinces ; but a careful examination of the facts will show that the dividing barrier has been made more visible, not overthrown. In the proper case, I trust this court would assume its due responsibility in abrogating laws which infringe upon constitutional provisions. But the rights of individuals will be better protected, the enjoyment of property will be rendered more secure, and general confidence in the adminstration of justice will be more firmly established, if we lean to the side of sustaining rather than impairing public acts which have heretofore been unquestioned, and which originated in the wisdom of a co-ordinate branch of the government. The remarks of Chief Justice MARSHALL, in *Fletcher v. Peck*, 6 Cranch, 128, are sound and appropriate to the present dis-

cussion : " The question whether a law be void for its repug-
nance to the constitution, is at all times a question of much
delicacy, which ought seldom, if ever, to be decided in the
affirmative in a doubtful case.   The court, when impelled by
duty to render such a judgment, would be unworthy of its
station could it be unmindful of the solemn obligations which
that station imposes.   But it is not on slight implication and
vague conjecture that the legislature is to be pronounced to
have transcended its power, and its acts be considered as void.
The opposition between the constitution and the law should
be such that the judge feels a clear and strong conviction of
their incompatibility with each other."

Were the question open for a discussion of the expediency
of this act, many weighty reasons might be assigned for con-
tinuing it in force.   Aside from disturbing vested interests
and deranging business relations, there is to my mind a public
utility, both in the good which it aims to accomplish and the
evils it is designed to remedy, which commend it to public
favor.

The law abhors a multiplicity of actions.   It favors peace
and repose.   No tyranny has been found more odious in the
older states than is sometimes exhibited in the pertinacious
obstinacy of one man, who pursues his common-law right of
resisting the occupation of his land, perhaps of some small and
insignificant but indispensable portion, for the purpose of a
mill.   The graceless privilege of commencing daily suits for
the daily infringement of constitutional rights is often less
detrimental to the enterprising individual, who may be its
victim, than to the community, who are common sufferers.
The statute which cuts off the common-law privilege of such
a man to indulge in litigious malice, and which secures to him
ample compensation by a single action for his property taken
for public use, is surely benign in its effects, and harmonious
with the spirit if not the letter of the constitution.   Such a
law, also, by inviting capital into the interior of the state, by

encouraging enterprise and diffusing the conveniences of social life, enhances the value of land, advances its settlement, and promotes general civilization.

In making these suggestions, I am not unmindful that a different view of the matter was urged by the counsel in the argument. It was ably and earnestly contended that the law in question infringes upon common right; that even the slightest departures from abstract justice are dangerous, and that public liberty requires perpetual vigilance in resisting the exercise of unauthorized power. These positions, in the abstract, are not denied. But they come far short of warranting a direct interference by this court to assert the paramount authority of the constitution over the discretion, wisdom and authority of the legislature. I forbear, however, to pursue the discussion.

The judgment of the circuit court is reversed, with costs.

LARRABEE, J., delivered the dissenting opinion of himself and Chief Justice STOW.

We must dissent entirely from the opinion of our brethren; and while expressing a proper respect for the decisions of sister states, which seem to sustain their views, still, we deny that the restrictions upon the exercise of sovereign power, or the rights guaranteed to their citizens, are identical with those arising under the territorial government.

It by no means follows that, because an act of the legislature of Massachusetts has been held to be constitutional and valid, a precisely similar act of the territorial assembly of Wisconsin is not in direct contravention of some right guaranteed by the ordinance of 1787 to the people of the territory northwest of the river Ohio. The one act may be the offspring of a power clearly delegated, while the other may be a despotic encroachment upon the rights of the citizen, just as clearly guaranteed. The powers of the former are defined and limited by a written constitution; and so were the powers of

the territorial assembly clearly and plainly defined by written laws of congress.    It has never been claimed that the territorial legislature of Wisconsin possessed the power and jurisdiction of parliament, which, Sir Edward COKE says, "is so transcendent and absolute, that it cannot be confined, either for causes or persons, within any bounds."    It is to these acts of congress that the people of the territory looked for their legal and political rights.    They are :

*First.* The ordinance of 1787.

*Second.* The organic act of the territory of Wisconsin, passed in 1836.

The organic act, in strict conformity with a provision of the ordinance, extended the existing laws of congress over the territory so far as they were applicable ; but we find no provision extending the constitution of the United States or any of its restrictions.    It is true, the people of the North West territory were made "subject to the articles of confederation, and to such alterations therein as shall be constitutionally made ; " or in other words, they were not created a separate, independent government, but were at all times to be under the control and subject to the sovereignty of the confederation.    But the constitution was formed by the concessions of independent states—was a compact between them —and the North West territory was no party to it, but only a mere provincial government, invested with certain delegated powers, the exercise of which was always to be under the control of congress.    There was no single attribute of sovereignty belonging to the territory ;  the people were no party to the government of the confederation ;  they had no delegate in the convention which framed the federal constitution, nor was their assent either asked, nor was it necessary to its ratification.    They were given, it is true, certain *rights*, before the present organization of the general government, and a solemn compact was made with them that those rights should not be taken away without their consent ; and these

rights, as contained in the article of compact, were just as far beyond the reach of congress as they were beyond the power of their own legislature. Their consent was neither asked nor given to any modification which may be found in the federal constitution. Hence, some rights possessed by them are unknown to the citizens of many of the states, and many rights are secured to the citizens of the states by the federal constitution, which are denied the people of the territories. Thus, the inhabitants of the district of Columbia and of the territories cannot sue citizens of a state in federal courts. *Hepburn v. Ellsey*, 2 Cranch, 445; *Corporation of New Orleans v. Winter*, 1 Wheat. 91.

. Nor is the judicial power of the territorial courts part of the judicial power of the United States as given in article three of the constitution, but it is only such power as is given by virtue of the general right of sovereignty which exists in the general government, or by virtue of that clause which enables congress to make laws regulating the territories belonging to the United States. *The American Insurance Company v. Three hundred and fifty-six bales of Cotton*, 1 Pet. 544.

So, the provision in the constitution of the United States, which declares that private property shall not be taken for public use without just compensation, was intended solely as a limitation in the exercise of power by the general government, and was not applicable to the legislatures of the states or of the territories. And the provision of the seventh amendment to the constitution, which declares that in actions at common law, where the value in controversy shall exceed $20, the right of trial by jury shall be preserved, does not apply to the state governments, but restricts only proceedings in the federal courts. *Barron v. Mayor and Council of Baltimore*, 7 Pet. 343; *Livingston v. Mayor of New York*, 8 Wend. 85.

The rights guaranteed to the people of the territory of Wisconsin were not those secured to the citizens of the states

by the federal constitution, but those contained in the "articles of compact," in the ordinance of 1887, which articles were to remain forever unalterable, unless by common consent.    That was their only fundamental law; and the constitution of the United States had no operation further than was necessary to enforce such "laws of congress" as were applicable to the territory and its inhabitants.    The right to the writ of *habeas corpus* and the right of trial by jury are found, it is true, in the constitution, but so are they in the the ordinance of 1787 ; and it is by virtue of the latter instrument that our people enjoy their blessings, and not because of their existence in the former.    The organic act of Wisconsin was passed long after the adoption of the constitution, and had congress possessed the power to supersede the articles of compact of the ordinance, it would have, no doubt, guaranteed the rights, as far as applicable to a territory, contained in the constitution, rather than recognized those of the ordinance.    This latter instrument—one of the most remarkable productions of legislative wisdom found in the annals of the world—has ever been regarded by the people of the North West territory as the palladium of their legal and political rights ; and the most sacred guaranty that none, even the least, could be taken away, unless by their consent.

Hence it is that no effort has ever been successful to abrogate any of its provisions, though such efforts have been made. A striking instance occurred at an early day.    In answer to a letter to congress, from Gov. HARRISON, then president of a convention of the people of the Indiana territory, signifying their assent to the suspension of the sixth article of compact, prohibiting slavery or involuntary servitude in that territory, Mr. RANDOLPH, of Va., in his report of March 2, 1803, which report received the sanction of congress, says : "That the committee deem it highly dangerous and inexpedient to impair a provision wisely calculated to promote the happiness and prosperity of the northwestern country."    In fact,

no pretense of authority has ever been set up, either by the congress of the confederation, the congress of the constitution, or the people of the northwest territory, to abrogate any of its provisions, unless by the common consent of the people on the one hand and the congress on the other.    This "common consent" must be regarded as having been given, when the people of the several territories adopted constitutions modifying the provisions of the ordinance, and congress had admitted them as states of the Union.

To the ordinance, then, and not to the federal constitution, did the people of the territory look ; for it was never enacted that, in addition, they should have the rights under the constitution which are guaranteed to the citizens of the several states, or, in fact, any other rights or immunities than those contained in the ordinance and the subsequent laws of congress.

It follows, then, that the territorial government possessed but limited powers, derived from written laws of congress ; and in all its acts, which in any way related to the rights of person and property, it should have been controlled and governed by the restrictions therein contained.    Hence, in the consideration of the case at bar, we cannot see what possible application can be made of the provision of the federal constitution, which declares that " private property shall not be taken for public use without just compensation."    *We are considering an act of the territorial legislature, and not a law of congress.*    Had congress passed an act authorizing the property of an inhabitant of the territory to be taken for the use of the general government, providing therefor a just compensation, the whole train of argument by which the act of 1840 is sought to be sustained would be pertinent ; but here we have no such act.

Let us inquire what rights *were* secured to the people of Wisconsin ; in what cases the legislature could authorize the seizure of private property, even for the use of the government

—for the " public use," if you please. It will be refreshing, to say the least of it, to examine the principles of the ordinance and see if we can find anything which will warrant the high stretch of legislative power which this act bears upon its face. The second article of the compact is as follows : " The inhabitants of the said territory shall always be entitled to the benefits of the writ of *habeas corpus* and the trial by jury ; of a proportionate representation of the people in the legislature, and of judicial proceedings according to the course of the common law. All persons shall be bailable, unless for capital offenses, where the proof shall be evident or the presumption great. All fines shall be moderate, and no cruel or unusual punishments shall be inflicted. No man shall be deprived of his liberty or property but by the judgment of his peers, or the law of the land ; and should the public exigencies make it necessary, for the common preservation, to take any person's property, or to demand his particular services, full compensation shall be made for the same. And in the just preservation of rights and property, it is understood and declared that no law ought ever to be made, or have force in the said territory, that shall, in any manner whatever, interfere with or affect private contracts or engagements, *bona fide* and without fraud, previously formed."

Here we have, in comprehensive language, the strongest and most sacred guaranty of the enjoyment of rights and property. It is more expressive than *magna charta* or even the constitution of the United States. *Magna charta* provides that no " freeman shall be disseized or divested of his freehold or his liberties, but by the judgment of his peers .or the law of the land." The constitution, " that no person shall be deprived of life, liberty or property without due process of law ; nor shall private property be taken for public use without just compensation ; " while the ordinance declares that " no man shall be deprived of his liberty or property but by the judgment of his peers or the law of the land ; and should

*the public exigencies make it necessary for the common preservation* to take any person's property, or to demand his particular services, full compensation shall be made for the same." This restriction upon legislative power, it will be seen at once, is far more stringent than the provision of the constitution. In one case, the taking of private property is authorized, only when the public exigencies shall make it necessary for the common preservation ; in the other, whenever the *public use* shall require it.    Under the former, the act could be justified only in case of imminent danger to the government itself; under the latter, whenever the sovereign may need property in the ordinary relations of government, for lighthouses, harbors, etc.    The restriction upon the exercise of the right of eminent domain is widely different in the one case from that in the other.    We also see the same restriction thrown around the person ; for no man's services could be demanded by the government unless the common preservation required them, and only then upon full compensation.

But as the act of 1840 is sought to be justified, on the ground that the person whose property is authorized to be taken by its provisions is deprived of it only by " the judgment of his peers or the law of the land," it will be necessary to examine still further this provision of the ordinance.    It will be observed that there is a strict analogy between the provisions as found in the ordinance and in the constitution. That branch which provides that no person shall be deprived of liberty or property but by the judgment of his peers or the law of the land, is a distinct right, independent of that secured in the latter clause.    It secures to every man his liberty and property from the mere arbitrary encroachments of private persons.    When, from his own act or negligence, or the act or negligence of another, he shall be brought within the control of a court of justice, then he shall not lose his liberty or property but by the judgment of his peers or the law of the land.    He well knows what the *law* is ; for,

in another branch of the same article, he is given the right to "judicial proceedings, according to the course of *the common law.*" This branch of the article, then, guarantees the right of property in the strongest manner, and guarantees the right of trial by jury according to the course of well-defined and existing law. It can have no reference to that sovereign right of eminent domain by which the government, under certain restrictions, justifies the appropriation of private property for public purposes, and is no restriction upon it; for, if it were, whence the necessity of the latter clause? The first guarantees the right of liberty and property; the second is a restriction, and the only restriction upon the exercise of the right of eminent domain. Care must be taken not to confound the two provisions, for they certainly have no connection with each other. The first is no more a restriction upon the exercise of the right of eminent domain than the latter is a restriction upon the legal forfeiture of liberty or property for any cause known to the law.

This view is clearly enforced by BRONSON, J., in delivering the opinion of the majority of the court in the case of *Taylor v. Porter*, 4 Hill, 140, where he says: " Of course, I shall not be understood as saying that a trial and judgment are necessary in exercising the right of eminent domain. When private property is taken for public use, the only restriction is, that just compensation shall be made to the owner. But when one man wants the property of another, I mean to say the legislature cannot aid him in making the acquisition." And it has been uniformly held that any equitable and fair mode of ascertaining the compensation may be provided by the legislature, in cases where private property is taken for public use; and that the trial by jury is only required on issues in fact, in civil and criminal cases, in courts of justice. *Buonaparte v. Camden & Amboy R. R. Co.*, 1 Bald. C. C. 205; *Beekman v. S. & R. R. Co.*, 3 Paige, 45; *Railroad Company v. Davis*, 2 Dev. & Bat. 451; 2 Kent's Com. 339.

Newcomb vs. Smith.

It was also held by Cowen, J., "*In the matter of John and Cherry Streets*, 19 Wend. 659," in speaking of the phrase, "due process of law," that our constitution adopts the very words of Coke, and means undoubtedly by that, that to work a change of property from *one private person to another*, some proceeding must be had in a court of justice or before magistrates."

It follows, then, that under the fundamental law of the territory of Wisconsin, as has been repeatedly held by the federal and state courts, in relation to the analogous provisions of the constitution of the United States, that the only provision, in any way authorizing the taking of private property for the use of the government, is the one which relates to the "common preservation."

This provision was just as much a part of the fundamental law of the territory, and just as restrictive of legislative power as that noble and original principle immediately following, which declares that, "in the just preservation of rights and property, it is understood and declared that no law ought ever to be made, or have force in the said territory that shall in any manner whatever interfere with or affect private contracts or engagements *bona fide*, and without fraud previously formed;" a provision which it may be justly feared the law-making power has overlooked in an act of more recent date.

If, then, in the examination of the question presented in this case we shall lay aside entirely, as a matter with which we have nothing to do, the phraseology of the federal constitution, and confine ourselves to the powers of the territorial legislature as they are found in the ordinance and acts of congress, we shall escape the whole train of false premises and reasoning by which this law is sought to be sustained. If we but keep in view, that if the territorial legislature had power to take private property at all, it could only take it when the *public exigencies made it necessary for the common preservation*—that this was the only emergency upon which it could

decide, and that it had not the whole range of objects for legislative construction, and the term "public use," from a state canal down to a private mill-dam—we shall have no difficulty in coming to a correct conclusion.

The act of 1840,* under which the complaint in this cause was made, is an almost literal copy of a law of the state of Massachussetts.

This act authorizes any person owning lands upon a stream of water, to erect and maintain thereon a "water-mill," and a dam to raise water for working it, and to flow permanently lands not belonging to the owner of the mill ; or, in other words, provides that such owner may obtain an easement in the soil of another, which nearly or quite deprives the proprietor of all the benefit of his lands *forever*. There is no pretense, either by express words or by the remotest implication, that the "common preservation" requires this exercise of sovereign power ; nor is the act sought to be sustained on that ground. It, in fact, in no manner differs in principle from an act authorizing any person to take and enjoy the property of another for any other purpose whatever, a steammill, a distillery, or a corn-field. It is sought, however, to be sustained on the ground, and on that alone, that "mills" have always been regarded as things of great public utility ; that the public good, the "public use," requires their erection, and justifies the taking private property for their maintenance. But this right of taking property for the "public use," we have shown, did not exist in the fundamental law of Wisconsin ; and even if it did, or could be in any way derived as necessary to carry into effect powers expressly granted, it would be easy to show that this act is far from being justified or warranted by it. It does not even declare that "water-mills" are required for the public use ; nor can we ascertain from any of its provisions that the legislature so considered them. The provincial law of Massachusetts (12

_____
* For the principal sections of the act, see the majority opinion in this cause.

Anne, chap. 8), from which both the statute of Massachusetts and this act seem to have been taken, was intended to be applied to " grist-mills," and perhaps " saw-mills ; " and provided also, that the jury were to determine " how far the flowing might be necessary, *and was justified by the public convenience.*"

This is essentially different from the act of 1840. No provision is anywhere made for determining, in any given case, whether the public convenience or public good requires the erection of the mill ; nor is there any specification of the kind of mill, whether a grist or saw-mill, a distillery or a fulling-mill. Any man can, under our act, erect a mill of any kind and enjoy the lands of another for his own private benefit. It is never declared or ascertained, either by the legislature in the act itself, or by the court or jury in enforcing its provisions, that the taking a person's property in any given case is for the " public use." But the right to determine this exigency is delegated to " any person " who may choose, for his own advantage or spite, to erect a " water-mill." The fundamental law on the one hand, secures to every man the protection of liberty and property, guaranteeing that his property shall only be taken when the " common preservation," or, if you please, the " public use " requires it, and only then upon just compensation ; while on the other hand, this provincial legislature, acting under the same law, strikes at the very foundation of the whole fabric, and gives to " any person " the right to take another's property whenever it suits his whim, his malice, or his convenience. The public use is a secondary consideration ; in fact it is lost sight of entirely —is never ascertained or declared.

Again : this act is justified by appeals to similar provisions in the statutes of several of our sister states. But it ᵛ is believed that in all the states, with the single exception of Massachusetts, there is some method provided for determining in each case, either by the verdict of a jury, or it is

declared by the legislature itself, whether the public good requires the exercise of this right of eminent domain. In but four states—Maine, Massachusetts, Rhode Island and Michigan —is the land allowed to be taken *first*, and the damages assessed afterwards; in all the others, where the common-law remedy is abrogated, the land must be first judicially condemned and compensation provided, before it can be taken for the use of mills. In many of them, "grist-mills" are alone mentioned; while, in nearly one-half the states of the Union, the strict common-law remedy is preserved. It is believed that, with the single exception of Massachusetts, no legislative power has attempted to make such an inroad upon the common law as the territorial legislature of Wisconsin—and this, too, under a much more stringent restriction than that found in any state constitution. Nor have these acts passed unquestioned, either by enlightened courts or by distinguished legal scholars. Angell on Water-Courses, 131.

Again : Another writer, speaking of the Massachusetts law, says : "Such an invasion of private property can only be defended in a case of great public necessity and utility. And yet the legislature, as well as the courts of law, in that state, seem to have been disposed rather to enlarge than curtail the power of mill owners, who have unwarrantably been allowed in cases where no public necessity or utility called for it, to take private property for their own private uses." Note to *Stowell v. Flagg*, 11 Mass. 366.

In the comparison which we have made between the Massachusetts act and the one under consideration, it will be observed, that we have treated the former as if it had been passed subject to the constitution of the United States, or to the similar provisions which are common to most, if not all, of our state constitutions. But it is to be borne in mind that that act, so far from being passed in subjection to the guarantees of the rights of person and property, which the revolution secured to the American people, was one of the

last acts of despotism and encroachment upon private right of the last of the Stuarts, a family whose name has become a synonym of tyranny, and whose favorite policy it was to enslave its colonial subjects as an entering wedge to the destruction of all personal, civil and political immunities at home. A family whose fate may well be a warning to all governments, of the certain retribution which inevitably follows the invasion of human rights ; and it is somewhat astonishing that at this day, in the middle of the nineteenth century, and here in this territory northwest of the Ohio, such a law, emanating from such a source, should be resorted to as an exposition, in fact, nullifying the rights which DANE and JEFFERSON, and the statesmen of their day supposed they had secured to the citizens of their model republic.

Enough has been said to show that no pretense can be found in the whole act, that the property of the citizen is allowed to be taken even for the " public use," to say nothing of the " common preservation." It is nothing more nor less than an arbitrary seizure of one man's property, and giving it to another, under pretense of converting it to the use of a water-mill, which mill may or may not be required for the public convenience. It authorizes the seizure and appropriation of my wheat field, orchard or dwelling house for the purposes of a water-mill ; delegates to the owner of that mill, and to him alone, the power of determining whether the public good requires such appropriation, and gives to me precisely that " just compensation " which a law-suit may or may not secure, in the shape of a *judgment*, and a lien upon a mill and dam that is just as likely to be worth less than my lands, as it is to be worth more. But upon this feature we shall have occasion to remark hereafter, in considering a different branch of the argument. We might here appropriately rest, and decline any further consideration of the cause ; but as the questions presented are of vital interest, as perhaps influencing in some measure the future legislation of our state, we

feel it a duty to pursue the investigation, at the risk of extending this opinion to an unnecessary length.

The provision in our constitution, which is analogous to the one we have been considering, as found in the ordinance of 1787, is modified from the stringency of the ordinance, and is similar to the one in the federal constitution. If, then, we should consider the act of 1840 in its bearings upon this provision, it will be necessary to inquire, what is the proper and legitimate meaning of the words " public use ? " This inquiry is appropriate and necessary when it is recollected that the act in question is sought to be defended as entirely analogous to the taking of private property for the construction of canals, roads, bridges, etc. By the term *public* is meant the whole body politic, or all the citizens of a state. *Weeks v. Sparke*, 1 M. & S. 690. A distinction, however, seems to have been made between the terms *public* and *general*, and they are sometimes used as synonymous. The former term is applied strictly to that which concerns all the citizens, and every member of the state, while the latter includes a lesser, though still a large portion of the community. 1 Greenl. Ev. § 128. This distinction has been constantly recognized and enforced by writers upon public law. The same definition is so forcibly and clearly set forth in the opinion of Senator TRACY, in the case of *Bloodgood v. M. & H. R. R. Company*, 18 Wend. 56, that we cannot forbear quoting it at length : " We are then to inquire, first, whether the term *public use* is not to be confined to its simple sense of *direct* possession, occupation and enjoyment by the public ; and second, is not the power of taking private property for public use, in any event, such an attribute of sovereignty that it must be exercised directly by the sovereign, acting through public political agents, and cannot be delegated to individuals or corporations not public political agents, to be by them exercised at their own discretion and for their own benefit ? When we depart from the natural import of the term ' public

use,' and substitute for the simple idea of a public possession or occupation that of public utility, public interest, common benefit, general advantage or convenience, or that still more indefinite term, public improvement, is there any limitation which can be set to the exercise of legislative will in the appropriation of private property ? The moment the mode of its use is disregarded, and we permit ourselves to be governed by speculations upon the benefits that may result to localities from the use which a man or set of men propose to make of the property of another, that moment we are afloat, without any certain principle to guide us. One man, unwisely, perhaps, prefers to suffer his lands to be unoccupied, or his water-power to remain unimproved, which another is anxious to convert to uses highly advantageous to the public. On what principle shall a law, transferring the title from the owner to his more enterprising neighbor, on the payment of a just compensation, be pronounced unconstitutional, if using property *beneficially to the public* is to be deemed a public use of it ? The remark of an eminent jurist (2 Kent's Com. 340), that ' it must undoubtedly rest in the wisdom of the legislature to determine when public uses require the assumption of private property ; and if they should take it for a purpose not of a public nature, as if the legislature should take the property of A. and give it to B., the law would be unconstitutional and void,' is correct, if intended to concede to the legislature merely the power of determining what property, in a particular case, shall be taken for the public use ; but it cannot be correct if intended to concede to the legislature the power of determining *what constitutes a public use of private property ;* and therefore I must dissent from the position taken by the Chancellor in *Beekman v. S. & S. R. R. Company*, 3 Paige, 73, where he says : ' If the public interest can be in any way promoted by the taking of private property, it must rest in the wisdom of the legislature to determine whether the benefit to the public will be of sufficient

importance to render it expedient to exercise the right of eminent domain, and to authorize an interference with the private right of individuals.' This position, it will be seen, disregards the distinction between a public use and a public interest in a particular use of private property, and confers on the legislature the right of determining, first, that the public interest will be promoted by the particular use of private property, and next, because the public interest will be promoted by such use, that therefore it is a public use; and finally, it being a public use, it becomes a mere question of expediency with the legislature whether they shall authorize private property to be taken to subserve it or not. It seems to me that such a construction of legislative power is inconsistent with the secure possession and enjoyment of private property, and repugnant to the language and object of the constitutional provision. Indeed, it concedes to legislative discretion a wider range than I think could be maintained for it on the principles of natural law, if we had no written constitution.

"It is not denied that the legislature is the most appropriate organ of the sovereignty of the state for exercising the right of eminent domain, but they can only exercise the right or power in subordination to the constitutional authority, which authority they cannot enlarge or modify. The condition that the property must be taken for public use is as much above their reach and control as it is above the reach and control of the lowest functionary of the government, who, like them, may have occasion to invoke this attribute of sovereignty in an emergency of some humble department of the public service, with which he may have been charged. The legislature may fitly determine when and under what circumstances—as to the mode of taking—private property may be taken for public use. But it by no means follows, as seems to have been supposed, that the legislature can determine that a *particular use* is a public use of private property, within the meaning of the constitution. The nature of the use to which

the legislature may dedicate the property of a citizen is not established by the name which they give it, but is an inherent and inseparable quality or characteristic which cannot be changed, however it be denominated.

"Therefore, to insist that the determination or expression by the legislature, that it is for the public interest and expedient in a particular case to exert the right of eminent domain, or the power of sovereignty, *ipso facto* establishes that the power of sovereignty is rightfully exerted, is in effect to insist that the power of the legislature is above the power of the constitution, and to prove that, instead of possessing a government of defined and limited powers, we have one with powers more extensive and irresponsible than those of the regal governments of Europe. I concede freely to the legislature the right to appropriate private property to the public use, but confidently deny to it the power of making that a public use which, in its nature, is not."

In speaking of a decision of a court in Tennessee, where it was held that, under a law passed in 1777, the land of one citizen could be taken for the use of the mill of another, on the ground that the mill was necessary for the neighborhood, and the miller a public agent, he says : " If, however, this case decides the general proposition that the legislature can appropriate the land of one citizen to make a mill-dam for another, it must, also, in effect decide the more startling proposition, which, I am sure, neither the courts nor the people of this state are prepared to admit, that the legislature can transfer the unimproved mill-site of one citizen to another, for the purpose of enabling the latter to build a mill for the public accommodation."

We have quoted from this case at length ; but have done so because we did not wish to impair the force of the argument. It is, perhaps, the most lucid and convincing argument upon this interesting and, strange to say, somewhat vexed question, that can be found anywhere in the books. The

power of the legislature, however, to delegate to railroad and turnpike companies the right to take private property for the construction of their roads, upon paying a full compensation therefor, was recognized in the decision of the court. In this same case of *Bloodgood*, Chancellor WALWORTH refused to sanction the doctrine advanced by Chancellor KENT, in the case of *Jerome v. Ross*, 7 Johns. Ch. 344 that it was not even necessary that a remedy should be provided for obtaining compensation in each particular case ; but held, that before the legislature could authorize the taking property, either by its own agents or by incorporated companies, an adequate and certain remedy must be provided for the payment of the damages or compensation.    The citizen was not bound to trust to the justice of government to make provision by future legislation.    The compensation must either be ascertained and paid to him before his property was thus taken, or an appropriate remedy must be. provided, and an *adequate fund*, out of which he might be certain of his compensation. He further held, that the citizen, whose property was thus taken from him without his assent, was not bound to trust *to the solvency of an individual*, or even a corporation for such compensation.    In this case it was decided that it was a *condition precedent*, that the damages should be assessed and paid before the company could actually appropriate the land for the purposes of a railroad.    It was not to be presumed that the legislature intended to have the individual seek an uncertain remedy by action.    This is now regarded as the settled judicial construction of the enlightened courts of New York, of the clause in her constitution, in relation to the taking of private property for public use.

And here will at once be seen the wide departure between the acts of the legislature of New York and the law of 1840, which we have under consideration.    In this act, the seizure and absolute appropriation of the land is authorized in the first instance — not by the government, through its political

agents, or under pretense of being for the use of the body politic ; nor by an incorporated company acting under a special grant of power ; but by " any person " who may deem it convenient for his own personal advantage. No provision is made even that the mill owner shall take any steps to ascertain the damages or value of the property at any time afterwards, and tender or pay it to the person whose lands he has seized ; but the only remedy afforded the victim as a compensation for the outrage is by *petition* to a court of justice. No " adequate fund " is provided ; his only recompense, in case of failure to pay by the mill owner, is a judgment and lien upon the mill and its appurtenances, and which, by our exemption act (Session Laws, 1848, p. 40), in most cases will not be subject to execution. How does this accord with the settled and fundamental doctrine that government has no right to take private property for undeniably *public* uses, *without full compensation being made therefor ?* It seems to be necessarily implied that the indemnity should, in all cases which will admit of it, be previously and equitably ascertained, and be ready for payment concurrently in point of time with the actual exercise of the right of eminent domain. 2 Kent's Com. 339, note *c*. This doctrine of prior, or concurrent, payment is held by Chancellor WALWORTH, in the case of *Lyon v. Jerome*, 26 Wendell, 485, and seems, withal, too obviously equitable to require judicial sanction.

But not only is no adequate provision found in the law of 1840 for compensation, but it is further provided that the advantages resulting to his property, by the erection of the mill, shall be deducted by the jury from the gross value of his lands ; in other words, a direct appropriation is made of private property for the purposes of a water-mill ; and this appropriation not made by the government for the public use, but undeniably, in nine cases out of ten, for the mere private advantage of an individual at the expense of his neighbor.

In *Van Horne's Lessees v. Dorrance*, 2 Dall. 313, it was held that no just compensation could be made except in money ; and that no other compensation could be forced upon a citizen whose property had been taken. This case, although it has been questioned, has never been overruled by the courts of Pennsylvania. It is true, that it has been uniformly held in New York and other states, in cases where streets have been opened in cities, and in many cases of turnpike roads, that the enhanced value of the property might be deducted from the estimated value of the property taken ; and in such cases we are not at this time prepared to deny the correctness of the doctrine. But this feature of our law of 1840, when taken in connection with the whole object and meaning of the act, is, we think, open to serious question.

This doctrine, however, has never been sanctioned by the courts of Kentucky—the actual value of the property taken being secured to the owner without any deduction for mere speculative enhancements of value. *Rice v. Turnpike Co.*, 7 Dana, 81 ; *Dutton v. Louisville*, 5 id. 28 ; *Jacob v. Louisville*, 9 id. 114.

It is an undeniable fact, that in most of the instances in the states of the Union, where the right of eminent domain has been exercised, the seizure of private property has been in a more arbitrary manner and with less regard to the right of property, than has been shown by the parliament of Great Britain. In all the acts of parliament since the revolution of 1688, which authorize the taking of private property for public purposes, provision is either made for compensation *first*, or a certain and adequate fund provided ; and in no case that we have been able to find is the mere speculative advantage to the owner, made an offset to the value of the property taken. And even Napoleon, when at the height of his imperial power, did not dare to seize the humble stall of the cooper, though the ground upon which it stood was absolutely necessary for the erection of a public edifice.

It may seem startling to assert that in this republican country, and at this age, property is held by a more uncertain tenure than in the limited monarchies of Europe ; but if laws, such as the one under consideration, are not only to pass unquestioned for years upon the pages of the statute-book, but are to be sustained and encouraged by enlightened courts of justice, we may as well at once admit the fact and pause and inquire into the necessity and objects of government. While these stretches of legislative authority may seem to have been justified by the wants of a vigorous and rapidly growing country—in the necessity of stretching out a vast net-work of roads and canals—still it cannot be denied that the right to the enjoyment and dominion of private property has, in many cases, been compelled to yield to unwarrantable exercises of sovereign power.

It becomes, too, a pertinent inquiry whether the right of eminent domain existed at all in the territorial government. The sovereignty was undoubtedly vested in the general government up to the time of the admission of Wisconsin into the Union on an equal footing with the original states. It could not exist in the two governments at the same time, for one was entirely dependent upon the other for its very existence. If this position is correct, it follows that the restriction in the ordinance was designed to operate only upon the power of congress, and consequently no power was given to the territorial legislature to take private property for any purpose ; and there being no power expressly given, or necessarily inherent, there could be no necessity for a restriction upon it. But we forbear to pursue this branch of the case further.

There is another question which we deem of equal importance with the one just considered. Section 28, of the act of 1840, takes away the common-law right in all cases where the land of another is flowed by the erection of a dam. The entire character of the proceeding is changed, and a complaint under the statute is made to take the place of the common-law

remedy. It is said that a person who is charged with the appropriation of his neighbor's land has no right, when brought into a court of justice, to complain that he is not proceeded against according to the course of the common law ; that he shows himself a trespasser and not entitled to be heard. A monstrous doctrine. As well might it be said that should the legislature authorize a person to be put upon trial for murder, upon the mere petition of another, the person charged with the crime, though in the custody of the court, could not complain that he was not proceeded against by indictment. Art. 2 of the ordinance, we have seen, provides that the inhabitants of the northwest territory shall be entitled to "*judicial proceedings according to the course of the common law.*"

Blackstone says, book 1, p. 68, that the common law "is that law by which proceedings and determinations in the King's ordinary courts of justice are guided and directed."

When the ordinance was framed, the whole northwest territory was, with but few exceptions, an unbroken wilderness. The field was fair and open for the exercise of legislative wisdom, and no ancient rubbish was to be removed. When, then, the "common law" was adopted as the rule by which judicial proceedings were to be governed, was it not adopted in its broadest and most comprehensive sense? It cannot be supposed for a moment that the words were used in their limited signification as contradistinguished from equity, but that judicial proceedings were intended to be guaranteed according to the comprehensive scope of the common law of England, including equity and admiralty, as well as law. This right of judicial proceedings, according to the *course* of the common law, undoubtedly vested in the people of the territory the right to courts of justice comprehending the combined jurisdiction of the Chancery, the King's Bench, the Common Pleas, and the Exchequer. Though perhaps it may be said that courts possessing these powers were not

established cotemporaneously with the ordinance, yet this fact in no way impairs the force to be given to the meaning of the article.    In that branch of the ordinance which provides for the organization of the territorial government, appointment of officers, etc., and which is entirely independent of the articles of compact, and subject to be changed at any time by congress, we find the court is given a " common law jurisdiction."    Now, if the words in this connection are to be taken in their limited sense, as merely organizing a court of *law*, not comprehending equity, still, this fact is no argument against the comprehensive signification which, we think, must be given to the other provision.    Conceding, therefore, that the term is used in a different sense in the one place from the other, it does not follow that courts could not be established under the ordinance possessing equity powers.    In fact, not only were such powers given to the territorial courts of Wisconsin by the organic act, but probate courts were also established ; and yet, it cannot be said that in establishing these courts any infringement was made upon the right of judicial proceedings according to the course of the common law ; but, on the contrary, congress was but providing the means by which such right could be enforced.    We do not, therefore, while claiming this right for the people of the territory, thereby deprive them of the right to suits in equity.

The defendant in error in this cause comes into court and asks : " By what authority am I brought here ; what sort of a ' judicial proceeding ' is this by which I am to be tried ? Is it one at all known to the common law ?    For if it is not, I ask to be dismissed."    Is he not entitled to be even heard ?    Can it be answered : " Sir, you are here by virtue of an act of the legislature ; that is a sufficient guaranty of your rights, and you have no right to question its validity ; because, forsooth, you would thereby admit yourself to be a trespasser !"    The *law of the land* in bills of rights, says RUFFIN, C. J., in *Hoke v. Henderson*, 4 Dev. 15, " does not merely mean an act of

the legislature, for that construction would abrogate all constitutional protection.    The clause means, that statutes which would deprive a citizen of the rights of person or property, without a regular trial according to the course and usage of the common law, would not be the law of the land in the sense of the constitution."*

Nor can it be said with any show of reason, that because this act provides for an assessment of damages by a jury in a court of justice, that therefore the act is no infringement upon the right of the citizen to judicial proceedings according to the course of the common law, for trials by jury are not alone known to the common law of England, but are found in all those countries which adopted the feudal system.    We conclude, therefore, that this act is in direct violation of the ordinance of 1787, and also of the constitution of the United States :

1. Because there is no pretense that the seizure of private property by virtue of its provisions is necessary for the " common preservation."

2. That it is neither declared in the act itself, nor ascertained in any manner that the seizure is for the " public use," either of the body politic itself, in its political or any other capacity, or of any considerable portions of its citizens.

3. That not only is no provision made for a just compensation prior to or concurrent with the seizure, nor is any adequate fund provided for a subsequent compensation, but the owner is left to his action, and a direct appropriation made of a portion of his property for the benefit of the mill owner.

4. That the sacred right secured to every citizen of the territory northwest of the river Ohio, of judicial proceedings according to the course of the common law, is virtually wrested from him, and a novel, uncertain and insufficient remedy offered in its stead.

* See, also, Story's Commentaries on the Constitution, vol. 3, 661, and *Taylor v. Porter*, 4 Hill, 146.

Newcomb vs. Smith.

The principal argument, and as far as we can understand, the only one by which this law is sought to be sustained, is that of expediency—an argument never entitled to much weight with a judicial tribunal, and, in a question like this, involving private rights and constitutional guarantees, deserving of no consideration.   It always has been and ever will be the argument of tyranny—the *prima ratio regis*—for no despotism was ever so absolute or coerced a people so debased, but what it sought to excuse or justify its most exceptionable acts by some pretense of expediency.

But even on the score of expediency, there can be no reason which would warrant the continuing this statute in force.   Its tendency is to unsettle that confidence in the secure possession of property which it is so important to cherish in every stable and well regulated government.   The example of Massachusetts is hardly the best one for us to follow.   Her manufacturing power and wealth may have become so identified with her interests as a state as to actually give tone to her government, and even to the judicial decisions of her enlightened courts.   But in the young and vigorous agricultural state of Wisconsin, no such influence can or ought to exist.   Now, that this court has failed to declare it void, it is hoped that the legislature of our state will perceive its entire incompatibility with a just preservation of the right to the dominion of private property, and wipe it from the pages of our statutes. We acknowledge that it is at all times a delicate and unwelcome task to interpose the power of a court in declaring an act of the legislature unconstitutional and void. It is, however. clear that whenever a law is in violation of a constitutional principle, that the former must give way ; and it is the duty of a court to pronounce it null and void.   " It is in the fearless discharge of this duty that the only effectual barrier is found against the arbitrary exercise of political power."

* In the subsequent cases of *Stevens v. Marshall*, 3 Pinney ; *Thien v. Voegtlander*, 3 Wis. 461; *Fisher v. Horicon Iron Manf. Co.*, 10 Wis. 351; *Babb v. Mackey*, id. 371, the