The Attorney General vs. The City of Eau Claire and others.

# THE ATTORNEY GENERAL VS. THE CITY OF EAU CLAIRE and others.

CONSTITUTIONAL LAW. *Improvement of Navigation.* (1) Semble, *legislature may authorize, by city.* (2) *Act authorizing dam, otherwise invalid. not supported because dam incidentally improves navigation.*

WATER WORKS. (3) *Legislature may empower city to construct, and therefor to build dam.* (4) *And city may lease surplus water power.* (5) *But cannot maintain dam merely to lease water power.* (6) *Nor optionally for private use.* (7) *Public use must affirmatively appear.*

STATUTORY CONSTRUCTION. (8) *Act must fairly bear construction consistent with constitution.* (9) *Ch. 333, Laws 1875, construed and held invalid. Powers to erect water works therein sought to be given, and to maintain dam, booms, etc., held distinct and independent. Latter not dependent on any public use. Taxation therefor not authorized.*

JURISDICTION: SUPREME COURT: INJUNCTION. (10) *When exercised. Suit must be brought on leave, on question* publici juris, *and* prima facie, *one affecting sovereignty of state, its franchises, prerogatives, or liberties of its people.* (11) *Not to restrain local taxation.* (12, 13) *Nor, encroachment on local highways; but may be invoked to restrain encroachment on principal navigable rivers.* (14) *And court will give full relief by restraining levy of tax.*

PLEADING. (15) *What information or bill must show. Not only claim of power, but apparent intention to exercise.* (16) *Amendment allowed.*

1. It seems that the legislature could empower a city to improve the navigation of a river within its limits, and the power would not be impaired by the fact that the work so authorized would improve the navigation outside of the city. But the power conferred on the defendant city by ch. 333, Laws of 1875, to dam the Chippewa river, etc., cannot be supported on that ground, there being nothing in the act indicating that its object was the improvement of the river, but the contrary being implied by its terms.

2. If the building of the dam mentioned in the statute would *in fact* improve the river, this would not support a power not granted for that purpose, nor authorize the court to impute to the legislature an intention in the act nowhere indicated by it.

3. The legislature may empower a city to establish water works for its use (that being a public and municipal purpose), and may also confer any legitimate power in aid thereof, such as the power to construct and maintain a dam, not obstructing the navigation of a public river or violating any other public or private right.

The Attorney General vs. The City of Eau Claire and others.

4. Where a city is authorized to erect and maintain a dam for a public municipal use, the legislature may also empower it to lease any surplus water power created by such dam.

5. But the maintenance of a dam for the purpose of leasing the water to private persons for private use is not a municipal or public purpose, for which a municipal corporation can be authorized to exercise the power of borrowing money and levying taxes. And *quære*, whether such a corporation could be empowered to erect and maintain a dam for such a purpose independently of taxation.

6. A statute which undertakes to empower a city to erect a dam, leaving it optional with the city whether the dam shall be used for a public or for a merely private purpose, is invalid.

7. Where a statute purports to confer a power upon a municipal corporation, the public use or purpose must appear affirmatively from the statute.

8. Courts will, as far as possible, place such a construction upon a statute as will reconcile it to the constitution, and will seek to give it effect under the constitution, in accordance with the intention with which it was passed. And they will presume that it was framed and passed in good faith, and not with intent to effect an unconstitutional purpose by means of ambiguous provisions. But where it will not fairly bear a construction consistent with the constitution, they must refuse to enforce it.

9. Sec. 1 of said ch. 333 of 1875 authorizes the defendant city to construct a dam across the Chippewa river, within the limits of the city; to construct water works; to open and construct drains, sewers and mains for the same; to establish water rents and to provide for their collection. Sec. 2 requires the city to construct booms and piers in the slack water of the dam, for protecting the navigation of the river, and for assorting and storing logs, etc. Sec. 3 authorizes the city to lease the water power of the dam for manufacturing purposes, except so much as may be needed by the city for hydraulic purposes, and to lease the piers and booms, and fix the rates of boomage and storage, etc. Sec. 4 requires the dam to be constructed with a lock for steamboats, and with chutes for logs, lumber, etc. Other sections relate to the manner of construction, the navigation of the river, etc.; and the act requires an election to accept the power, and, in case of such acceptance, authorizes the issue of bonds by the city in aid of the works, providing for their payment out of the revenue of the works, and a tax to supply deficiencies. *Held:*

(1) That on the face of the statute the power to erect the dam and piers, booms, etc., incident to it, and the power to establish water works, are entirely *distinct and independent powers.*

VOL. XXXVII — 26

(2) That, the power to erect and maintain such dam not being made dependent on any public use, the city takes no authority under the act to build such dam across a public river, or to borrow money or levy taxes for the purpose.

10. It is not enough to put in motion the original jurisdiction of this court, that the question is *publici juris*, but it should also be one "affecting the sovereignty of the state, its franchises or prerogatives, or the liberties of its people," and one also in which the interest of the state is primary and proximate, not secondary and remote. And the court will judge for itself in such case whether the wrong complained of is one which requires "the interposition of *this* court to preserve the prerogatives and franchises of the state in its sovereign character"; and its rule now requires that all cases in which such original jurisdiction is invoked, "shall proceed on leave, upon a *prima facie* showing that the case is one of which it is proper for this court to take cognizance." *Attorney Gen. v. Blossom*, 1 Wis., 317; *Attorney Gen. v. R'y Cos.*, 35 Wis., 425.

11. In ordinary cases this court will not exercise its original jurisdiction to restrain local municipal taxation for alleged irregularity or want of authority, the proper jurisdiction for that purpose being in the circuit court, whether the action be properly brought by the attorney general or by owners of property affected by the tax. And the court would decline jurisdiction of this cause if the only remedy sought were restraint of taxation by defendant to build the dam in question.

12. This court would be unwilling to extend the exercise of its original jurisdiction to cases of encroachment on mere local highways. But navigable waters leading into the Mississippi and St. Lawrence rivers are a trust accepted by the state from the federal government, which the state is bound to keep as common highways forever free to the people of this state and of the United States; and an encroachment thereon is a *purpresture* which concerns the sovereign prerogative of the state and the prerogative jurisdiction of this court.

13. Where any obstruction of such a river is undertaken *without valid authority*, this court, in a proper case, will exercise its original jurisdiction by injunction to restrain it; and the party undertaking to put in the unlawful work will not be heard to contend that it will not create a *material* obstruction.

14. Where this court takes jurisdiction of an information to restrain a municipal corporation from obstructing a public river by a dam, it will also grant any further appropriate relief sought, as by restraining the levy of taxes to construct such dam.

15. An information to restrain a corporation from performing a certain act, must show not merely a claim of power to do the act, but an apparent intention to exercise the power.

16. The information in this case pleads an ordinance of the defendant city providing for an election to determine whether it will accept the power granted in terms by said ch. 333, but alleges no other act or purpose on the part of the city or its officers looking towards the construction of the dam. The time for the election has passed; and it appears by affidavits that such election was held, and the power accepted. *Held*, on motion for that purpose, that a temporary injunction cannot issue upon the information, without amendment; but the defect in the pleading having been overlooked by both parties, and the motion having been fully argued upon the merits, leave will be given the attorney general, on his application therefor, to amend the information and renew his motion; and, the necessary averments being then found, the motion will be granted and the writ issued without further argument.

INFORMATION for Writ of Injunction brought by the attorney general against the *City of Eau Claire*, its mayor, aldermen, the members of its common council, and its city clerk, to restrain them and their respective successors in office from entering upon the construction of the works purporting to be authorized by the provisions of ch. 333, Laws of 1875, entitled "an act to amend chapter 16 of the private and local laws of 1872, entitled 'an act to incorporate the *City of Eau Claire*.'"

The first three sections of the act of 1875 are as follows: "Sec. 1. The common council of the *City of Eau Claire* are hereby authorized and empowered to build, construct and maintain a dam, not exceeding sixteen feet in height, across the Chippewa river at such place, within the limits of said city, as it may determine; to construct water works, to open and construct drains, sewers and mains for the same; to establish water rents and provide for the collection thereof. Sec. 2. The common council of said city are hereby authorized, required, and empowered to erect, construct and maintain in slack water, created by the dam, authorized by this act to be constructed, such piers and such store, assorting, shear, side and glancing booms, as it may deem sufficient for protecting the navigability of said river for steamboats, logs, lumber, timber, fence posts, and railroad ties, and properly assorting and safely storing of saw-logs,

timber, fence posts, and railroad ties.    Sec. 3.  The common council of said city are hereby authorized to let, lease and rent the water power, or any part or portion of the same, which may be created under the provisions of this act, for manufacturing purposes, except so much thereof as may be needed by said city for hydraulic purposes, and may also let, lease and rent the boomage, piers and booms which may be created and erected under the provisions hereof, and may fix the rate of boomage and storage of saw logs, timber, fence posts and railroad ties, at such price as it may determine, not exceeding fifty cents per one thousand feet, board measure, for saw logs and timber, and not exceeding one dollar per hundred for fence posts or railroad ties."    Section 4 provides that the dam shall be constructed with a sufficient lock for the safe passage of steamboats, and separate chutes for the safe passage of logs, etc., and so as not to materially obstruct the navigation of the river.  Section 5 prescribes that the piers and booms shall be so constructed as not to obstruct the navigation of the river for logs, lumber, etc., and so that logs designed for points below can be speedily separated from those designed to be stored in the store booms.    Sections 6 and 7 provide for a clear and free passage for all boats, logs, lumber, etc., designed for points be low.    Section 8 makes the city liable for damages sustained by unreasonable delays or by the insufficiency of the works, and for negligence in operating the same.    Section 9 is as follows:  "The common council of said city may issue the bonds of said city, for the purpose of constructing the works authorized by this act, at such times as it may determine, after the question of constructing such works, and issuing of such bonds shall have first been submitted to a vote of the legal voters of said city, and decided in favor of such works, and of issuing such bonds, by a majority of the votes cast at such election. Such bonds shall be of such denominations, and draw such rate of interest as the common council may determine; and when issued, shall be signed by the mayor, and countersigned by the

clerk of said city." Section 10 prescribes that all moneys received for lease of water power, water rent, etc., shall be applied to keep the works in repair, pay interest on the bonds issued for the construction, and for creating a sinking fund; and for deficiencies authorizes the annual levy of a tax.

The information, after alleging the corporate character and limits of the defendant city, its situation upon the river, its system of government, the navigability, capacity and commerce of the river, recites the act of.1875, and avers that after its passage, and on or about March 1, 1875, the common council of the defendant city by resolution and ordinance, duly passed and published, ordered that the question of construction of the works, and issuing of the bonds, purporting to be authorized by the act, be submitted to a vote of the legal voters of the city at the next charter election to be held May 11, 1875.    The ordinance is recited at length, and provides for the submission of the question, and the form, canvass and return of the votes The information avers that the expense of the works mentioned in the act will be about $400,000; that their maintenance will be attended with great annual expense; that they will prevent the free use of the river for navigation, and cause great public injury; that many of the resident and nonresident tax payers are opposed to the construction; that the construction of the same, unless restrained by injunction, would be of great and lasting injury, etc.    The prayer is in the usual form for an injunction to restrain the construction of the works, and the issuing of bonds therefor.

The counsel for the state moved, upon the information, for a temporary injunction.    In opposition to the motion a number of affidavits were submitted and read, tending to prove that the works contemplated by the act would not obstruct, but rather improve the navigation of the river, and facilitate the floating of lumber through the "Dells" at that place; that the cost of the works would not involve the city in debt beyond the constitutional limitation; that the city, its buildings being for the

most part constructed of wood, and many of them saw mills, was peculiarly exposed to, and had suffered from many, disastrous fires, and that the water works authorized by the act had been in fact contemplated, and the bill framed with a view to their construction to guard against fires.

The state was represented in the argument by *L. S. Dixon, J. M. Bingham*, and *Geo. B. Smith;* the *City of Eau Claire* by *Alex. Meggett, Wm. F. Vilas, J. C. Gregory* and *I. C. Sloan.*

*L. S. Dixon*, of counsel for the state, for the motion:

I. *As to the jurisdiction:*

As decided in the railway injunction suits, at the last term of the court, the original jurisdiction conferred upon this court by sec. 3, art. VII of the constitution, of the class of writs therein named, *habeas corpus, mandamus, quo warranto, certiorari*, and including, also, the writ of *injunction*, is of a prerogative or *quasi* prerogative nature, designed, on information or complaint of the attorney general, as its representative, or the representative of all its people, in their public or political capacity, to protect the sovereignty of the state, its franchises and prerogatives, or the rights and liberties of its people, from usurpation or other violation, infringement or invasion of any kind. Are the wrongs complained of in this action, and for the redress or prevention of which it is instituted, of this nature — such as pertain to the sovereignty of the state, its franchises and prerogatives, or the rights and liberties of the people, and as raise questions *publici juris*, as distinguished from those involving mere private right? We answer that they are, and that it is not only competent and proper for the attorney general to sue in the name of the state, but it is his bounden duty to do so; that such is the only remedy afforded by the laws for wrongs of this nature, and that no private individual can maintain an action for the same or any kindred relief.

The opinion of the learned chief justice in the *Railway Injunction Suits* goes very far towards solving the question whether the matters here involved are of public or private concern in

the sense of the clause of the constitution conferring original jurisdiction upon this court. The original jurisdiction of this court was granted for the better and prompter and more authoritative protection of public interests; and that such is its primary and controlling object and character, see *Attorney General v. Railway Cos.*, 35 Wis., 435, 519, *et seq.*

A glance at the use which has heretofore been made of the other writs named, and especially of the writ of *mandamus*, as to which the original jurisdiction of this court and the practice in it has been settled by a long line of decisions, will serve at once to show that the wrongs here complained of are public and not private in their character, and such as ought to be remedied in this action. It will be seen that questions affecting the smallest subdivision of the state government, the rights and privileges of the people forming local political bodies or communities, such as school districts and road districts, as well as those affecting subdivisions of the larger and more important kind, as counties, cities and towns, are questions *publici juris*, involving the sovereignty of the state, its franchises, and prerogatives, and the rights and liberties of its people, and presenting matters within the original cognizance and control of this court. The state is but an aggregation of these local political bodies or municipalities. They are the state and their people are the people of the state, to whom it owes the duty of public protection and public justice, against any invasion or infringement of the sovereignty of the state and of its franchises and prerogatives. The writ of *mandamus* has been several times put by this court to the use of redressing the wrongs of these local political communities, thus recognizing such wrongs, and most correctly, it is submitted, to be matters affecting state sovereignty and state prerogative. The first case that we find, and the first, we believe, in which application for the writ was made to this court, is the *State ex rel. Lord v. Board of Supervisors of Washington County*, 2 Pin., 552, where the purpose was to compel the defendants to proceed to the erection of a

court house and jail, and other buildings for the use of the inhabitants of the county. No question was made as to the jurisdiction of the court, but the application was denied on other grounds. The writ was allowed for the same purpose in *State ex rel. v. Supervisors of Portage County*, 24 Wis., 49. Some remarks of the chief justice in the first case will be hereafter cited. It has been issued to compel town assessors to reduce the amount of an assessment of personal property (*State ex rel. Ward v. Assessors of Delavan*, 1 Wis., 345); to compel commissioners on appeal from the decision of town supervisors relative to laying out a highway, to proceed to view and examine such highway and make return of their decision (*State ex rel. Doxtader v. Bailey*, 6 Wis., 291); to compel the board of supervisors of a county to expunge from the assessment roll descriptions of lands, which, being composed of separate parcels, are valued together at a gross sum (*State ex rel. v. Supervisors of La Fayette County*, 3 Wis., 816); to the officers of a county to compel them to perform certain official acts as a means of testing the validity of elections to remove a county seat or to change the area or boundary of a county (*State ex rel. v. Saxton*, 11 Wis., 27; *State ex rel. v. Elwood*, id., 17; *Attorney General v. Fitzpatrick*, 2 id., 542; *State v. Lean*, 9 id., 279; *State v. Fetter*, 12 id., 566); to the clerk of a school district to compel him to report to the town clerk of the town the amount of the value of the school house in his district, which had been apportioned to another school district (*State v. Eaton*, 11 Wis., 29); to the common council of a city to compel the levy and collection of a tax to pay a judgment rendered against the city, or to defray the expense of work done for it (*State v. City of Madison*, 15 Wis., 30; *State v. Beloit*, 20 id., 79; *State v. City of Portage*, 12 id., 562; *Same Case*, 14 id., 550; *State v. City of Milwaukee*, 25 id., 122); to compel the supervisors of a town to audit the amount allowed by a jury as damages for laying out a highway (*State v. Wilson and others, Supervisors*, 17 Wis., 687); to compel a county board of supervisors to allow one elected as a member

of the board to sit and act as such (*State v. Supervisors of Milwaukee County*, 21 Wis., 443); to compel a city treasurer to deliver over to the clerk of county board of supervisors, books relating to tax sales and redemptions (*State v. Hundhausen*, 26 Wis., 432); to compel the transfer of prisoners from the Milwaukee jail to the house of correction (*State v. Brunst*, 26 Wis., 412); to compel the mayor of a city to issue a proclamation and appoint officers, under an act which has been submitted to and accepted by the electors of the city (*State v. O'Neill*, 24 Wis., 149).

If we resort to the precedents in *quo warranto* instituted and sustained in this court, and which, as observed in the opinion in the *Railway Cases*, is often a concurrent remedy with *injunction*, we shall find what constitutes matters *publici juris* in the affairs of these local governments and bodies politic into which the state is divided, to have been, if possible, still more clearly settled and defined. If the court will turn to 1st Simmons' Digest, 689, title "Quo Warranto," and 2d same, 490, title "Quo Warranto," 2, it will find collections and a brief statement of all the cases of this nature, among which will appear an action to try the right to hold the office of treasurer of a city, 12 Wis., 310; directors of a school district, 13 id., 411; and justice of the peace, 23 id., 430. If the usurpation of the office of treasurer of a city, directors of a school district, or justice of the peace, be matters of public concern, affecting the sovereignty of the state, its franchises or prerogatives, and calling into exercise the original jurisdiction of this court, how shall it be said that the invasion of the legal and constitutional rights of all the people composing such bodies politic, in things of far greater moment, namely those pertaining to the right of private property and of protection against unlawful exactions and contributions, forced under presence of law, are not also matters of public concern? How shall it be said that the public, the people of the state, have such an interest in who holds the office of treasurer of the city of Eau Claire, that the

attorney general may come into this court and file his inform-
ation in the name of the state, to oust an intruder, and yet
that the public have no such interest in the unconstitutional
and wrongful imposition of a tax or burden of one hundred thous-
and dollars, or four hundred thousand dollars, upon the property
of the city and its tax payers and inhabitants, as will justify
the attorney general in coming here in the name of the state,
and suing to stay the proceedings and prevent the mischief ?
It is respectfully submitted that it is the duty of the attorney
general as guardian of the rights and interests of the public,
on information received, to sue in every such case, and that
whether he is required to do so by taxpayer or inhabitant or
not, and that his suit ought to be sustained in this court.    See
*State v. City Council of Charleston*, Mills Const. R. 13.

In submitting the foregoing decisions to the consideration of
the court, we are fully aware that there may be some among
them in which original jurisdiction was assumed by the court
contrary to the principles affirmed and the interpretation given
to the clause of the constitution in the opinion in the *Railway
Cases*.    Fully satisfied of the soundness of the latter interpreta-
tion, and believing it to be the only true one, we look to the
correction of many mistakes heretofore made by the court in
exercise of its original jurisdiction, and to the future limitation
of that jurisdiction to cases falling within the principles recently
announced.  The reports of the decisions of the court abound in
cases where the writs of *mandamus* and *quo warranto*, and I doubt
not also of *certiorari* and *habeas corpus*, have been used as in the
exercise of the orignal jurisdiction of the court, in vindication of
mere private rights and not rights connected with or pertain-
ing to the sovereignty of the state, its franchises and preroga-
tives, or the liberties and welfare of its people.    All this will
be corrected now, and the court no longer open to such appli-
cations.   The question of jurisdiction now presented, having
passed *sub silentio* in every case, the past action of the court
will present no obstacle to future amendment, and henceforth,

while correcting the excesses and usurpations of other officers, tribunals and public bodies, the court will not be guilty of excesses and usurpations itself. It is not surprising that the court looked in vain to the bar for assistance in the argument of the *Railway Cases*, when we reflect that both court and bar had been wandering in utter darkness for a period of more than twenty-five years.

It is unnecessary here to point to particular instances of error on the part of the court in assuming original jurisdiction, but we cannot forbear reference to one or two very notable ones. In *State ex rel. Graham v. The Chamber of Commerce of the City of Milwaukee*, 20 Wis., 63, the court took jurisdiction by *mandamus* to compel the defendant to restore the relator, who had been improperly expelled, to his rights and franchises as a member of the corporation. The defendant was a mere private trading or commercial corporation, possessing and exercising no public function or duty whatsoever, and the wrong complained of was merely private and personal to the relator, and affected or concerned no other individual whomsoever. A case farther removed from those involving questions *publici juris*, springing out of and connected with state sovereignty, state franchises or state prerogatives, could not well be imagined. And equally beyond the boundary set by the constitution, and wholly without the original jurisdiction of the court, was the still more recent case in *quo warranto, State on complaint of Farrell v. Conklin*, 33 Wis., 685, and again reported 34 id., 21. That was an action to try the right of the defendant to hold the office of treasurer of a private benevolent society, incorporated by act of the legislature, to oust the defendant from the office and install the relator as the person who had been duly elected to fill it. There, too, was not the slightest semblance of state prerogative or public or state interest or duty directly involved, and, as this court takes its jurisdiction under the constitution (*publici*) and not under the stat-

utes, and as no statute can either enlarge or diminish such jurisdiction, it was error to entertain the action.

But this is digression. Whilst the court has sometimes been inadvertently wrong in assuming a jurisdiction not given to it by the constitution, it has more frequently been right by keeping within the landmarks set to its original powers by that instru ment. It is believed that wherever the court has issued its pro cess to remedy wrongs or correct evils of a public nature — those affecting the political or constitutional rights of the whole or any considerable portion of the people of any of the municipali- ties or lesser governmental districts of the state, it has been dealing with questions strictly *publici juris*, and acting strictly within the original jurisdiction conferred upon it by the con- stitution. All these are public corporations, which expression, for the purpose of testing the original jurisdiction of this court, is, as observed in the opinion in the *Railway Cases*, un- derstood, also, " to include all *quasi* public corporations, whose relations with the public involve *public interests and public ques- tions*." 35 Wis., 544.

The remarks of Chief Justice STOW, in the case first above referred to (2 Pinney, 559, 560), upon the question whether the law providing for the permanent location of the seat of justice of a county, and for its division and the organization of another county, was a private and local law, bear with great force upon the question now under cnsideration. He says : " How this act can be said to be local, in a political and in the constitutioual sense of the word, passes my understanding. It is a public law concerning the police and municipal organiza- tion of the state. The state itself as an integral sovereignty is made up of lesser municipal organizations; the most essen- tial and important of which is the county organization. An admirable system ! and our greatest safeguard against the in- vention of modern despotism, *centralization*."

Substituting the word "private " for the word "local," where

it occurs in that opinion, and which would not materially alter
or disturb the sense, one might readily suppose that the great
lawyer and able judge by whom they were penned was discuss-
ing the precise question now in agitation before this court.  A
very strong impression seems to have pervaded the mind of the
chief justice that these lesser municipal organizations consti-
tuted a most essential and important part of the integral organ-
ization and sovereignty of the state itself, and consequently,
that whatever wrongs affected them, or the people or commu-
nities of persons composing them, and organized and associated
together for the purposes of local as well as general govern-
ment, were public wrongs, at the same time affecting the state,
invading its sovereignty, interrupting and frustrating its fran-
chises and prerogatives, and destroying the rights and liberties
of its people.   The whole body sympathizes and suffers when
there is disease or pain in any part.  ·As tapping an artery in
one of the extremities withdraws the life current from the heart
and impairs and destroys vitality in the natural body, so wrong
and injury inflicted upon or suffered by one of these lesser mu-
nicipal organizations withdraw the vital forces and impair and
destroy the sovereignty of the political body, the state.   Injury
to the parts involves injury to the whole body politic, and pro-
tection of the whole requires protection of all the parts.   Such
appear to have been Chief Justice STOW's views of this import-
ant question, and it cannot be doubted, we think, he would
have held it a question *publici juris* in a case like this.

In *Milwaukee v. Milwaukee*, 12 Wis., 83, 99, this court says:
" The operations of government depend to a very great extent,
for their success and accomplishment upon the existence and
agency of municipal corporations, such as counties, towns, cit-
ies and villages.   Without the delegation of a portion of its
powers to them, its ends and objects could not be accom-
plished."

Similar views were expressed by Judge DENIO, delivering
the opinion of the Court of Appeals in *Doolittle v. Supervisors*

*of Broome County*, 18 N. Y., 155. The act complained of being the unauthorized erection of a new town, the judge says: "The grievance is that they (the plaintiffs, seventeen in number) are all threatened to be subjected for the purposes of local administration to a jurisdiction not created according to law. This will affect not only the other freeholders besides the plaintiffs, but all the inhabitants of that local district, whether they are freeholders or not; for every person residing or owning property there will be liable, in a variety of ways, to the action of the local magistracy which the organization of the new town will call into existence. The same may be said of the portions of the original town of Chenango which fall within the limits of the two other towns attempted to be created, and in a less degree to all the people of the county of Broome; for in the legal arrangements for the administration of justice and the management of the fiscal affairs of the county, the magistrates to be chosen in the new towns will be often called upon to perform duties which will affect not only their proper towns, but the inhabitants of every town in the connty. In a still slighter degree, but to an extent which may be appreciated, the substitution of pretended legal authority, in any of the local divisions of the state, for the rightful magistracy, works an injury to all the people; for the various and complicated official agencies by which the public business is carried on require the cooperation of legal magistrates of every grade. An unauthorized and illegal change of the local districts into which the state, for the purposes of administration, is divided and subdivided, would naturally be productive of extensive inconveniences and losses to individuals as well as to the state in its corporate character."

The same doctrine prevailed in *Roosevelt v. Draper*, 23 N. Y., 318, where it was held that there was no distinction between cities and towns or counties with regard to the public character of their corporate acts, or of the wrongs perpetrated or threatened by them in their corporate capacity.

These authorities fully establish, it is submitted, that the

questions here submitted are questions *publici juris*, in the sense of the constitutional provision conferring original juris-diction upon this court, and so as to make it not only proper for, but incumbent upon, the attorney general to prosecute in the name of the state.

And the two cases last cited establish, also, the further prop-osition that the proceeding in the name of the state, conducted by or under the direction of the attorney general, is the only one which can be resorted to in such case, and that no private action, or action in the name of a private individual, can be maintained. They were cited with approbation and followed by this court in *Judd v. Town of Fox Lake*, 28 Wis., 583. It may be true that this court, in the two cases referred to in the introductory part of the opinion last cited, has held a different rule, and that private action may be sustained, but now that the remedy by injunction as a prerogative writ at the suit of the state is coming to be understood, it is confidently submitted that the rule of those cases ought no longer to prevail, and that only the public prosecution should be permitted. They are clearly inconsistent with sound and correct principle, as shown by the authorities above cited, and many others which might be named (see those cited in *State v Saline County, infra*), and no good reason is perceived why they should be adhered to. On the other hand, there are many reasons why they should not. "If one citizen may maintain such a bill, an indefinite number of others may each, also, bring separate suits; and an adjudication in one case concludes nothing as to the others, or as to the inhabitants at large." Dillon on Mun. Corp., § 736. Why should the municipality be subjected to a thousand pros-ecutions and the payment of a thousand bills of costs in suits which settle nothing? The impropriety of such prosecutions and the necessity for a single authoritative and effectual public one was discovered at a very early day, as will be seen from the following extract from the opinion in *State v. City Council of Charleston*, Mills' Const. R., 41. Answering the objection

that the information in the nature of *quo warranto* in that case was at the relation of a private person in the name of the attorney general, which, it was said, was improper, the court held that it was not, at such relation, and then proceeded to remark as follows : " But does it appear that this is for an individual injury ? I conceive it does not. On the contrary, it is a matter of general concern to all the corporators of the city. The complaint is that the city council has passed an ordinance unlawfully imposing a tax on bonds. Can this be said to affect Mr. Ravenal alone? If the charge be well founded, is it not a usurpation of the power of the state ? It is worthy of remark, that in two of the cases above quoted, *The King v. The City of London*, 2 Shower, 275 [*263], and *The King v. The Mayor of Tenterden*, 8 Mod. Rep., 114, this was the ground of complaint; and in the latter case, among the reasons assigned for granting the rule, is one which may be considered as a satisfactory answer to the objection that the individual has a remedy by action at law. ' The court directed that this matter should be tried upon information, and that for two reasons. The one, because a single individual might not be able to contest this matter in an action against the whole corporation ; and the other, because, if a verdict should pass for or against such single person, it would not end the contest which might happen with the rest.' " See also *Commonwealth v. Burrell*, 7 Pa. St., 34; *Reading v. Commonwealth*, 11 id., 196 ; *Buck Mountain Coal Co. v. Lehigh Coal and Nav. Co.*, 50 id., 91.

Precedents for injunctions at the suit of the attorney general, either in his own name or in the name of the state or of the king, to restrain municipal corporations or their officers from excess or abuse of corporate authority or franchises, to the common injury of the corporators or inhabitants, are not wanting in considerable numbers. *Davis v. The Mayor, etc.*, 2 Duer, 663 ; *People v. Lowber*, 7 Abb. Pr., 158; *Same v. The Mayor, etc.*, 10 id., 144; *Same v. Mayor, etc.*, 32 Barb., 102; *State v. Saline County*, 51 Mo., 350; *Att'y Gen'l v. Corp. of Poole*, 4 M.

The Attorney General vs. The City of Eau Claire and others.

& C., 17 ; *Same v. Mayor of Liverpool,* 1 id., 171 ; *Same v. Corp. of Lichfield,* 13 Sim., 547 ; *Same v. Corp. of Norwich,* 16 id., 225 ; *Same v. Com'rs of West Hartlepool,* L. R., 10 Eq., 152 ; *Same v. City of Dublin,* 1 Bligh., 312, N. S. ; *Same v. Mayor of Galway,* 1 Molloy, 103 ; *Same v. Guardians of Poor of Southampton,* 17 Sim., 6. And see, also, *Stockport Dist. Waterworks v. Manchester,* 9 Jur., N. S., 266 ; *Liverpool v. Chorley Waterworks Co.,* 2 De G. M. & G., 852, 860 ; *Ware v. Regent's Canal Co.,* 3 De G. & J., 212, 228 ; *Commonwealth v. Erie & Northeast R. R. Co.,* 27 Pa. St., 339, 340, 354–8 ; *Davis v. Mayor, etc.,* 14 N. Y., 506 ; *Benson v. The Mayor,* 10 Barb., 226 ; *Milhau v. Sharp,* 17 Barb., 445 ; *Board of Supervisors v. Keady,* 34 Ill., 293, 296, 297.

II. *As to the unconstitutionality of the act.*

Having endeavored to show the original jurisdiction of this court, and the necessity and duty of exercising it, the other question involved, namely, the unconstitutionality of the act of the legislature in controversy will, it is believed, on a mere citation of the authorities, take care of itself before this or any other judicial tribunal to which it may be presented. There is by possibility a bare hint — a thin and most flimsy external appearance of some public use of the city contained in the act. It remotely hints at establishing waterworks for the use and convenience of the inhabitants of the city, but the court cannot fail to see through the guise and discover the falsity of the pretext. The real features of the act are too plain and open to admit of doubt. The court cannot fail to see that the primary and important objects of the act, in fact, the only real and true ones, are to enable the city, by aid of moneys raised through the power of taxation, to engage in enterprises and embark in schemes of a purely private nature, viz., the building and maintenance of a dam and appurtenances for the purpose of manufactures, and of piers, booms and other structures for the purposes of caring for, storing, assorting and delivering of saw logs, timber, fence posts and railroad ties. These principal and only real objects of the act are manifest in every word and line.

The slender pretext of supplying the city with water, a thing not in truth contemplated, will be disregarded, and the real objects and intention of the bill will be looked at by the court.

" The revenues of the state are a portion that each subject gives of his property in order to secure or to have the agreeable enjoyment of the remainder. To fix these revenues in a proper manner, regard should be had both to the necessities of the state and those of the subject. The real wants of the people ought never to give way to the imaginary wants of the state.

" Imaginary wants are those which flow from the passions and from the weakness of the governors, from the charms of an extraordinary project, from the distempered desire of vainglory, and from a certain impotency of mind, rendering it incapable of withstanding the attacks of fancy. Often has it happened that ministers of a restless disposition have imagined that the wants of their own little and ignoble souls were those of the state." Montesquieu, Spirit of Laws, book XIII, ch. 1.

" Here, where all citizens are, in a certain sense, ' governors ' and ' ministers,' as well as ' subjects,' and projects for legislation, looking mainly to private gain and emolument, *though well cloaked under specious pretenses of regard for the public weal,* are as numerous as the locusts in Egypt, these suggestions of the wisdom and prudence of our old days ought to be carefully regarded; and it is especially becoming in our legislators to be cautious not to overstep the constitutional boundaries of their authority, nor to inaugurate a system of legislation, the manifest aim and end of which is to enhance private gain at the public expense." Opinion of justice BARROWS, 58 Maine, 608–9.

The following are the authorities relied upon by counsel for the state and which are submitted as conclusively establishing the invalidity of the act. *Brodhead v. Milwaukee*, 19 Wis., 624; *Curtis v. Whipple*, 24 id., 350; *Whiting v. S. & F. R. R. Co.*, 25 id., 167; *People v. Salem*, 20 Mich., 452; *Same v. State Treasurer*, 23 id., 499; *Thomas v. Port Huron*, 27 id., 320; *Hanson*

*v. Vernon*, 27 Iowa, 28; *People v. Batchellor*, 53 N. Y., 128; *Hooper v. Emery*, 14 Maine, 375; *Comins v. Bradbury*, 10 id., 449; Opinions of the Justices, 58 id., 590–623; *Allen v. Inhabitants of Jay*, 60 id., 124; *Stetson v. Kempton*, 13 Mass., 272; *Freeland v. Hastings*, 10 Allen, 570; *Jenkins v. Andover*, 103 Mass., 94; *Lowell v. City of Boston*, 111 id., 454; *Nat. Bank of Cleveland v. City of Iola*, 9 Kan., 689; *Loan Association v. City of Topeka*, 20 Wall., 655. To the point that the act was unconstitutional because it attempted to authorize the taking of private property for public use, without the necessity therefor being first established by the verdict of a jury, he cited *Seifert v. Brooks*, 34 Wis., 443.

*Geo. B. Smith*, for the motion, argued, in substance:

1. Two important questions are involved in this controversy, questions of such importance to the public as to fully justify the exercise of the jurisdiction of this court: 1. Have the legislature the right to authorize any body or corporation to erect a dam across the Chippewa river, it being a navigable stream? (Upon this question, counsel submitted an argument, made by him before the judiciary committee of the senate in 1871, upon the constitutionality of a bill, then pending, to incorporate the Chippewa River Improvement and Booming Company, the points of which, applicable to the present case, are as follows:) It is conceded that the Chippewa river is a navigable stream "in the ordinary sense of the term," and it will not be denied that this river is one of the navigable streams leading into the Mississippi river, and, that as such it is a common highway, free to all of the citizens of the United States. We say, therefore, that the legislature has no power or authority, either to obstruct or impede such free navigation, or to authorize any company of men to do it. Art. IV, of the ordinance of 1787, R. S., p. 1070, declares that "the navigable waters leading into the Mississippi and St. Lawrence and the carrying places between the same, shall be common highways, and forever free, as well to the inhabitants of the said territory

as to the citizens of the United States, and those of any other states that may be admitted into the confederacy, without any tax, impost, or duty therefor." The constitution of this state, art. IX, sec. 2, R. S., p. 40, substantially adopts the language of the ordinance above quoted on this subject. It is as follows: " And the river Mississippi, and the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways, and forever free, as well to the inhabitants of the state, as to the citizens of the United States, without any tax, impost, or duty therefor." Whether or not the ordinance of 1787, which was adopted in July of that year, was superseded by the adoption of the constitution of the United States, in September following, is a question which we need not discuss, since our state constitution adopts the language of the ordinance on this subject. It is proper, however, to refer to the fact, in this connection, that the territory comprising this state was granted to the United States by the state of Virginia before the adoption of the constitution of the United States, in convention, with the condition above named, among others. Every principle of good faith, therefore, requires that it should be observed. The government of the United States, by thus accepting the magnificent grant, became obligated to see that its conditions were forever observed, and thus far the action of the government of the United States, and the decisions of the courts of the United States, have in all cases respected. the binding effect of this ordinance in reference to all streams over which the United States have assumed jurisdiction. By applying the navigation laws to all of the navigable streams leading into the Mississippi, the United States have in fact assumed jurisdiction over the Chippewa river, at least so far as it is navigable for boats, and for this reason alone the state of Wisconsin has no right to obstruct or impede the navigation of this river, nor has it the right to authorize it to be done by others. See *Wheeling Bridge* case, 9 How., U S., 647 ; *S. C.*, 13 How., 519. See also the case of the *United*

*States v. New Bedford Bridge*, 1 Woodb. & Minot, 401, 411. Here it is expressly held, after full argument and thorough investigation, "that the states within what was governed by the ordinance of 1787, cannot impede or impair the navigation of rivers so declared free ; not merely free from toll, but free from obstruction."

This subject has, however, been settled in our own supreme court, in the case of the *Milwaukee Gas Light Company v. The Schooner Gamecock*, 23 Wis., 144. The court say : "A city ordinance *or an* act of the legislature forbidding vessels to drag their anchors in a navigable stream would be invalid, as far as it interfered with the rights of navigation secured by the ordinance of 1787." Thus we see that our court recognizes the binding effect of the ordinance of 1787, on the legislature and people of this state, and therefore we shall regard that question as settled here, no matter how it may have been decided in other courts, and in other states. We refer, also, to the case of *Hogg v. Zanesville Canal Company,* 5 Ohio, 410, opinion of Judge HITCHCOCK at p. 415 : "Had it been supposed that the navigation would have been in the least obstructed, it is not possible that any legislation would have taken place." In another part of the opinion he says, "such legislation would be absolutely void." This case arose in consequence of putting a dam across the Muskingee river in Ohio, which came under the ordinance of 1787, precisely as the Chippewa river in this state comes under the ordinance and under our own constitution ; in that case a charter had been granted by the legislature of Ohio for a dam across said river, just as is asked for here. After quoting the ordinance on this subject, the judge says : "This portion of the ordinance of 1787 is as much obligatory upon the state of Ohio as our own constitution ; in truth it is more so, for the constitution may be altered by the people of the state, while this cannot be altered without the assent of both the people of this state and the United States, through their representatives." Again, he says :

" Every citizen of the United States has a perfect right to its free navigation. With this right the legislature cannot interfere; in other words, they cannot, by any law which they may pass, impede or obstruct the navigation of this river; that which they cannot do directly, they cannot do indirectly. If they have not themselves the power to obstruct or impede the navigation, they cannot confer it upon an individual or corporation." This case is commented on and approved in 1 McLean, C.C., (Ohio), 336, and in *Palmer v. Commissioners*, 2 McLean, 226, and in this case the court says: " It would be difficult to maintain the power of any state to obstruct any of its navigable waters which extend through other states, or are connected with the sea or with waters flowing into the sea." We find the same doctrine stated in the *Wheeling Bridge Case*, in 13 How., as follows: "If the act of Virginia authorized the structure of the bridge, so as to obstruct navigation, it would afford no justification to the bridge company," p. 519, and in *Cox v. The State*, 3 Black. (Ind.), 200, speaking of an act authorizing a dam on White river in that state, the court say: " The act now in question is clearly unconstitutional and void, the ordinance of 1787, etc., puts it out of the constitutional power of the state, etc., to authorize such an obstruction."

So we say in reference to the power of the legislature: it cannot impair or impede the navigation of this river by erecting a dam across it, nor can it confer that power upon any individual or corporation. It may be said, however, that the legislature has a right to provide for improving the navigation of this river; possibly it has, but that is not the question now under consideration. It is sufficient to say now that this is not a bill to improve the navigation of the Chippewa river at the Dells where it is proposed to erect a 16 foot dam; this dam and this scheme is designed solely to create additional means for securing and holding logs for the use and benefit of those interested in this corporation, and the bill itself contemplates that the free navigation will be impeded or obstructed by this

dam, and it undertakes to provide, and it does expressly provide "that if the works contemplated shall obstruct or impede navigation (and there can be no doubt but it will) the company shall be liable for the damage," etc. Such was exactly the provision in the law in Ohio above referred to, and the court in that case said what the United States court said in the Wheeling bridge case, "that the legislature had no right to grant a charter, and that such charter would furnish no protection to those to whom it was granted."

The Chippewa river is navigable for boats and rafts from the Mississippi up to Chippewa Falls; to this point it is conceded to be "a navigable stream in the ordinary sense of that term," but above that point it is navigable for logs and lumber only, and only a short distance above that point is it navigable for lumber in rafts, but it is navigable for logs for a great distance above. All legislation which is intended to benefit one particular locality to the detriment of another, and which tends to obstruct or impede the free navigation of this river, is clearly beyond the power of the legislature. Such legislation would not only be unjust and oppressive, but it would not stand for an hour the test of judicial investigation.

By our constitution, every citizen of the state has a right to the free and unobstructed navigation of this river, and under the constitution and ordinance of 1787, every citizen of the United States has secured to him the same right, and "whatever may be said about the effect which the adoption of the constitution of the United States had upon the ordinance of 1787, congress has, by subsequent acts, so far recognized and adopted the ordinance of 1787, on this subject, as to give it the force of existing law." *Depew v. Wabash & Erie Canal*, 5 Ind., 8.

It may not be inappropriate, in this connection, and it may facilitate this investigation, to inquire what constitutes a "navigable stream?" What constitutes a navigable stream in this country has been defined as follows: In the case of *Morgan*

*v. King*, 35 N. Y., 459, the court say that "the public have a right of way in every stream which is capable in its natural state and in its ordinary volume of water of transporting in a condition fit for market, the products of the forests or mines or of the tillage of the soil upon its banks." Again the court say, "It is not essential that the capacity of the stream, as above defined, should be continuous, or in other words, that its ordinary stage at all seasons of the year should be such as to make it navigable." See also the case of *Moore v. Sanborne*, 2 Mich. (Gibbs), 525.

A river that will float logs   *   *   is navigable within the meaning of the ordinance. *Id.*, 525.

This stream is therefore navigable in every sense of that term. It is navigable for boats and rafts from the Mississippi up as far as Chippewa Falls in its ordinary stage of water, while it is navigable for logs only for a long distance above that point; but if it be said that sometimes in low water it is difficult for boats or even rafts to pass over the Dells near Eau Claire, we have to say that this fact can furnish no excuse for erecting a dam there, and we may reply in the language of the court in 35 N. Y., above quoted: "That it is not necessary that the capacity of the stream should be continuous, or, in other words, that its ordinary stage at all seasons of the year should be such as to make it navigable."

It is no excuse or justification for this legislature to say that sometimes the navigation of this river is imperfect; or difficult to accomplish, for that is true even of the great rivers of the country. It is impossible sometimes to navigate the Ohio river, and exceedingly difficult at times to navigate the Mississippi. Still this fact would hardly justify the state of Ohio in damming up said river, or the states of Wisconsin and Minnesota or Iowa in putting a dam across the Mississippi river.

Because a river is sometimes inconvenient to navigate is a very poor excuse for making it permanently so. Low water at the dells may sometimes occasion delay in the passing of

The Attorney General vs. The City of Eau Claire and others.

boats and rafts; but the river is navigable, and in all ordinary stages of water it is navigated with ease and facility, both for boats and rafts. A dam, such as is proposed by this bill, if made ever so perfect, would delay and impede the passage of boats at all times, and the chute for the passage of lumber with the slack water and pond, would at all times delay and hinder the quick and free passage of rafts down the river. It is no justification for the passage of this bill to say, that in extreme low water, rafts cannot run down or boats up — for, if that were so, it would justify the putting in of dams in many places, in the Mississippi river, and other great rivers of the country. * * *

2. Have the legislature the constitutional power to authorize the *City of Eau Claire*, or any municipal corporation, to tax its people for such an enterprise as is contemplated by ch. 333, Laws of 1875 ? The power to tax is conceded by the highest judicial tribunals of our country to be unlimited. It is " the power to destroy." *McCulloch v. Maryland*, 4 Wheat., 316. But taxes are burdens, or charges, imposed by the legislature upon persons or property, to raise money for *public* purposes. Cooley's Const. Lim., 479. When the legislature undertakes to tax, or authorize a tax in aid of a purely private enterprise or personal object, the act is void. *Olcott v. Supervisors*, 16 Wall., 689 ; *People v. Salem*, 20 Mich., 452 ; *Jenkins v. Andover*, 103 Mass., 94 ; Dillon on Mun. Corp., § 587 ; 2 Redf. Law of Railways, 398, note 2. The question here presented arose a few years ago in Maine. A bill was pending in the legislature, and the house of representatives requested the opinion of the justices of the supreme court upon the following questions: " Has the legislature the authority under the constitution to pass laws enabling towns, by gifts of money or loans of bonds, to assist individuals or corporations to establish or carry on manufacturing of various kinds, within or without the limits of said towns ? And, if towns thus authorized may assist private parties, may they go further, and establish man-

ufactories entirely on their own account, and run them by ordinary town officers or otherwise?" These questions were both answered in the negative. 58 Me., appendix, 590. In further support of this position counsel also commented upon the cases in Judge Dixon's brief, *Sharpless v. Mayor*, 21 Penn. St., 147; *Grim v. Weissenberg School Dist.*, 57 id., 433; *Brodhead v. Milwaukee*, 19 Wis., 652; *Foster v. Kenosha*, 12 id., 616–619, 623; *People v. Batchellor*, 53 N. Y., 128. As to the act in question, counsel contended that it can not be claimed that it is other than an attempt to authorize a tax for a private purpose. It can not be claimed that it is an act for the improvement of the Chippewa river. If it were so in fact, the act would be void, as "a state burden," such as the improvement of the river, "is not to be laid upon any territory smaller than the state." "Equality of the imposition of the burden is of the very essence of the power itself." *People v. Salem*, 20 Mich., 452. Counsel contended that the act was not intended to create water works for *Eau Claire*, nor to improve the navigation of the river, but was intended to make a water power and booming facilities at that place, and commented on the several sections of the act, arguing that in the first section there was no connection between the building of the dam and the construction of the water works. The city may build the dam, may establish the water works, may do either or both, may build the dam and lease water power and not establish the works. The clause, "may establish water *rents*," proves it to be water power, and not water works, sought to be attained by the act. "Rent" is a profit in money, etc., issuing out of lands, as a retribution for its use. 2 Bouv. Law Dic., 434. If water works had been designed, the term "water *rates*" would have been used. "Rate, a public valuation or assessment of every man's estate, or the ascertaining how much tax every one should pay." The second section of the act relates only to boomage. The third section throws off all disguises and relates only to boomage, and the rates thereof, and the lease of water

power, and is entirely silent as to the creation of water works. Sections 4 and 5 clearly show that the act was not intended to improve the navigation of the river, as they provide that it shall not be obstructed materially. Sections 6 and 7 are restrictions mainly, but show the real purpose of the act, as does section 8, none of them referring to water works, but to water power, and the boomage of logs. Section 10 also gives no hint that water works are contemplated, but refers only to the revenue to be derived from power rents, etc. Thereby it is provided that the people of Eau Claire are to be taxed forever to keep up and maintain dams and booms in and across the river, and are forever made liable for all damages which may occur to parties by the careless management of the dam or booms, or which they may cause to navigation, and this is called a law to authorize the city of Eau Claire to establish water works to supply the people with water! If there can be a case made for the interference of a court of equity to prevent the consummation of wrong and injustice, surely this is one.

*Wm. F. Vilas, contra:*

I. So far as the information or bill charges that the proposed works will obstruct the free navigation of the river and do irreparable damage, either as a ground of jurisdiction, or as a cause of action, it will not avail to support the suit. 1. Because, it is a matter wholly within the legislative power of the state, the river being entirely within the territory of the state, subject only to the supervisory control of congress. *Gilman v. Philadelphia*, 3 Wall., 713, 729–30; In Wheeling Bridge Case, 13 How., 518; Opinion of TANEY, C. J., 582–3. 2. Because the act in question expressly provides against any material obstruction in the stream to navigation by the works, and it cannot be assumed that the act will be violated. So that to attack the works on that ground now is not only premature, but it is to declare an act unconstitutional or invalid for a reason that the act itself specially provides against. 3. Because the allegation is mere matter of opinion, with no spe-

cific allegation of facts to support it, and such an opinion cannot prevail against that of the legislature. And 4. Because the affidavits read by defendants' counsel serve to prove that the navigation of the river will rather be benefited than injured by the proposed improvements.

II. The act is constitutional.

As an act to establish means for supplying the city of Eau Claire with water, it is conceded to be within the constitutional limits. The right of municipalities to make such improvements is well settled, and conceded. 1 Dillon on Mun. Corp., sec. 97 ; Cooley's Const. Lim., 533. See remarks of STORY, J., in *Vidal v. Girard's Ex'r.*, 2 How., 127, 189, and remarks of COLE, J., in *Bushnell v. City of Beloit*, 10 Wis., 195, 226. It is conceded, also, that, if upon building a dam for the purpose of making a reservoir and obtaining power to drive the pumps, more water power is obtained than present exigencies demand, it is competent to authorize the city to lease it, etc., and this concession is supported by authority. *Spaulding v. Lowell*, 23 Pick., 71, 80. The court in this case say, that, if the town, under color of authority to do a lawful thing, abuses its grants of power, it may be restricted. But the court is asked to declare upon *the face of the act itself* that the legislature has perpetrated a trick. That under pretense of authorizing a lawful thing to be done, it has really authorized an unlawful work.

This is resisted on several grounds: 1. The court will not impute to the legislature base purposes ; and if it should, will not declare its act invalid, if within its constitutional *power*. All *discretion* in respect to the expediency of the act is legislative, all consideration of reasons for passing it. See authorities collected in brief of counsel in *Brodhead v. City of Milwaukee*, 19 Wis., 658 ; *Sharpless v. The Mayor, etc.*, 21 Penn. St., 147. 2. Because the court will not construe a law so as to be unconstitutional, but rather support it, and will restrain the municipality from exercising under it functions which would be, if exercised, an attempt to make use of the act for unlawful pur-

poses.    Thus a due regard for a coordinate branch of the
government, and all private rights, are protected and preserved.
3.  Because there is no foundation in the act for any such criti-
cism.    The first section is a simple grant of the powers neces-
sary to enable the city to construct and maintain water works.
The ninth section provides the ways and means;  the tenth
directs the appropriation of all income to a sinking fund ;  the
second, fourth, fifth, sixth, seventh and eighth sections are all
*restrictions* and *limitations* on the first, designed to protect the
interests of all navigators to the fullest degree.    The third sec-
tion simply authorizes what is conceded to be within the power
of the legislature, the leasing of surplus water, and such
facilities as the works may incidentally afford for other bene-
ficial uses.    And here it is to be observed, that if, as the city
grows, this surplus is diminished, the city must diminish leas-
ing.    It could be so compelled to do by the courts.    It cannot
*sell*, as Judge Dixon concedes might be lawful.

III.  Suppose it should be conceded that the act of the legis-
lature authorizes the erecting for boomage of the slack water,
inevitably created by a dam, and the renting of surplus water
power.  What then?  1.  We insist that this is to be construed
to mean what the legislature have said, and to be regarded as
the use of incidental benefits, and as such it is conceded to be
valid.  2.  We maintain that in any event the powers granted
are to be viewed as granted *in connection with* an enterprise
perfectly lawful, and are not to be viewed as if it were a grant
to do the independent thing of simply building a dam for the
purpose of creating water power to rent, and booms to rent.
As such a power in connection with the use of the river for
water supply, it is clearly constitutional, because it is then
but the regulation and police of a portion of navigable water
within the corporate limits and in connection with the pub-
lic works.    It is akin to the power to build and maintain
wharves and charge wharfage, confessedly lawful.    Dillon on
Mun. Corp., § 67.    *Cannon v. New Orleans*, 20 Wall., 577 ;

*Dutton v. Strong*, 1 Black, 23, 32 ; *Vanderbilt v. Adams*, 7 Cow., 349.

IV. But I go still further, and maintain, that in any view of the case, whether taken in connection or taken as two separate projects, or a project to accomplish two ends, the one to build water works, the other to improve and render available the water power of the river to rent, and to render available the slack water caused for such navigation or craft as floats the river, the act is constitutional. It is attacked as designed for the latter purpose, because it is to employ taxation for private and not public uses. Much controversy has arisen as to what grounds are sufficient to enable courts to declare statutes unconstitutional. It is stoutly maintained by many judges that unless a written prohibition of the constitution is violated, a law cannot be so pronounced. See dissenting opinion of CLIFFORD, J., in *Loan Association v. Topeka*, 20 Wall., 655, on p. 668, and authorities. Conceding the view there maintained by the majority and elsewhere in many cases, to be correct, that taxation must be restrained to public uses, the question recurs what is a *public* use. None of the cases cited by Judge Dixon, where the power was denied, help this question. With no exception but the cases of railway donations, they are all cases of donations, etc., purely to private individuals. So we do not dispute the general proposition affirmed in the Opinions of the Justices, in 58 Me., although they have no weight as authority like an adjudication.

This case is none of these. The constitution prohibits the state from engaging in internal improvements. Sec. 10, Art. VIII of constitution. But it may and must delegate this function to municipal corporations, and there *is no constitutional restraint on them* (except the five per cent. debt amendment). It may confer on municipalities every power as to internal improvements, within or affecting directly the municipal people and territory, which the state could have exercised, but for this prohibition. *Clark v. Janesville*, 10 Wis., 135; *Bushnell*

JANUARY TERM, 1875.            431

The Attorney General vs. The City of Eau Claire and others.

*v. Beloit,* id., 195 ; *Sharpless v. The Mayor, etc.,* 21 Penn. St., 148 , *Freeland v. Hastings,* 10 Allen, 517.    What is the limit of the power of the state in the construction of internal improvements, on general principles?    Canals, railroads, harbors, dredging of rivers, building of dams, bridges, cultivation of fish in public rivers, are but illustrations of what has been repeatedly done.    These internal improvements are not forbidden to municipalities.

Could not *Eau Claire* build *street railways,* within her limits ? Water works, gas works, are but the same in principle.    Could she not appropriate money to stock the river with fish, to build dams, to cultivate them for general public use ?

The Chippewa is a natural highway within the municipal limits.    There is possibility, let us suppose, for vast and valuable water power there.    The legislature will not grant it to private persons.    There is more than any one wants or can afford to engage in the enterprise.    A public improvement is demanded to make this available.    To award just consideration to the interests of navigation, a public agent should be selected.    A public highway is to be made available for other uses than mere highway purposes.    Is it not competent to provide for this?    It is not to embark in any scheme of manufacturing.    No authority is given except to *rent* water power and *boomage,* and to regulate the whole matter.    It is not to take stock in a scheme extending beyond her territorial limits, as it was objected against railway subscriptions.    It is not to contribute to an enterprise to be managed by private persons or corporations.    All is to be under the dominion and control of the corporate authorities.    Revenues are to be exacted to support it and all to go to the city.    There is not a private citizen or private corporation or partnership mentioned as in any way to be aided or benefited.    The improvement is for the entire public and the privileges open to the enjoyment of all.    The vast resulting benefits to the community at large may be reasonably estimated to be equal or superior in kind and in

degree to any such as have ever flowed from public improvements. Why may *Eau Claire* have gas works, street railways, water works, public halls, and not have the benefit of its common public water power, worth all the rest and able to produce alone all the comforts and luxuries of life for the whole community, and to greatly increase the municipality?'

This argument might be further extended, but it is unnecessary to resort to it. I have conceded, for argument, more by far than was demanded by counsel for the state, and much more than the court will regard it just and proper, as I conceive, to determine as the object of the act. The purpose of the act upon its face, upon the ordinance passed, and from the necessities shown for such an improvement by the affidavits, is to obtain water supply for mains and conduits; incidentally other advantages may ensue. It is confessed the city can enjoy them. There being no other just construction of the act, as counsel for defendant submit, the latter point argued must be regarded as my own, not as one of joint deliberation.

The point of the decision in *Seifert v. Brooks* is, simply, that when a statute authorizes the user of the power of eminent domain in a manner which is essentially different from, or does not meet all the essential requirements of the course of proceeding which the constitution ordains, it is void. But the case does not meet the point urged by the opposite counsel to save their case. That point was, that a proper construction of the third section left it discretionary, or served to show that the act left it discretionary with the municipality to proceed to put in water works after the dam was built, but there to pause and use the dam for an unconstitutional purpose, and hence the act was unconstitutional.

Assuming, as this does, that the conclusion is right that such a work expressly authorized would be unconstitutional, which I most earnestly contend can not be maintained on reason or practical precedent, and, as it is confessed, which no court has gone so far as to decide, this point is fully answered: 1. That the

The Attorney General vs. The City of Eau Claire and others.

act should be *construed*, if it *possibly can be*, so as to support it. 2. That such construction is the very simple and ready one indicated by the act "at the first blush;" the one claimed by its friends, and plainly indicated by the legislature. 3. That, although no specific words require successive steps, yet charters do not generally, since they confer privileges, and the *acceptance* imposes all the obligations which words in the act could impose. 4. Such constitutional construction being given, the law is effective only according to such construction, and the court will limit the municipality to the exercise of such powers only as are constitutionally conferred by the act. 5. That the apprehension, therefore, that after the dam is built, the works for supplying the city with water may not be added, is an apprehension which could be felt of any such improvement, however constitutional, if a dam were the first step in the construction of it. It does not go to the constitutionality of the law. 6. If the municipality fail to proceed according to the law, as it shall be constitutionally construed, precisely the same remedies will be open that would exist in any case of perversion of a lawful authority. Thus all the disorder depictured is avoided by giving to the law the construction which its friends claim, and which is simple and natural, and by denying that which its enemies perversely raise upon it, merely to destroy it. In this view, it is not seen how *Seifert v. Brooks* affects the matter.

*I. C. Sloan, contra.* [No brief of *Mr. Sloan's* argument is found upon the files; and his occupations, since the argument of the motion, have not permitted him to prepare a synopsis of his argument for the reporter's use.]

RYAN, C. J. I. There is, perhaps, no doubt, that the legislature could grant, and the city, the defendant, could take power to improve the navigation of the Chippewa, within the limits of the city. Such power would not, perhaps, be impaired by the fact, that the improvement of the river authorized within the city might be of such a character as would improve it

without the city. Indeed it might be assumed, for any question here, that the city could take express power to improve the navigation, outside of the city, of a public river flowing through it.

But the power conferred on the city by ch. 333 of 1875, cannot be supported on that ground, because the statute itself does not go upon that ground. Neither in its title nor in its purview is there any indication that the improvement of the river is an object, or within the object, of the legislature. The statute no where purports to make provision for the improvement of the river. It provides that the dam which it authorizes shall not materially obstruct the navigation of the river; and to that end requires a lock, chutes and booms to be built. But, though it prohibits material obstruction of the river, there is in it no clause apparently looking to the improvement of the river; no word indicating that the improvement of the navigation of it is an object of the power conferred, or was within the legislative attention in conferring it. And there is not merely this negative, the absence of apparent intention. The prohibition of material obstruction by the dam positively repels all suggestion that the improvement of the river is an object of the dam. It is little likely that the legislature should provide against obstruction by that which was to be done for the purpose of improvement. The navigation of the river was within the legislative attention, and provision is made, not that the dam should improve it, but that it should not obstruct it. *Expressum facit cessare tacitum.* On the other hand, as will be seen, the statute plainly indicates other objects local to the city, without relation to the public use of the public river flowing through it.

It may be, as was said at the bar, that the dam authorized would, in fact, improve the navigation of the river. If so, that would be a consequence of the statute, not an object of it. The power conferred is independent of it. The statute was manifestly passed for no such purpose. And, if we could

assume the fact, it could not aid the construction of the statute. We know of no rule which would authorize us to impute to the legislature an object not expressed or indicated by it, or to support a statute upon grounds foreign to it. Dwarris, 657, 718; Sedgwick, 230–238.

II. The charter of the city, ch. 16 of 1872, authorizes the city to establish reservoirs, and to provide for the erection of water works for the supply of water to its inhabitants; and to make other improvements proper for their health and welfare; and to lease, purchase and hold real and personal property for their convenience. The statute of 1875 gives authority to the city to construct waterworks, and drains, sewers and mains for the same.

It is not worth while to consider whether, in this connection, the latter statute adds to the power of the city under the former; or whether both give effective power to establish and maintain water works. If the power prove defective, the legislature can enlarge it. See *Bonaparte v. C. & A. R. R. Co.*, Baldwin, 205. In considering this motion, we shall assume that the city possesses adequate power to establish water works.

And that is so essentially a public and municipal purpose, that it is obvious that the city can take any legitimate power in aid of it. For that purpose, the legislature could unquestionably grant and the city take power to construct and maintain a dam, not obstructing the navigation of a public river, or violating other right, public or private. And the dam so authorized might well produce an excess of power. *Superflua non nocent.* In such case, as was frankly admitted on the argument, the surplus water need not run to waste. The legislature might well grant and the city take power to lease it. The power to construct and maintain the dam would still rest on the public, municipal use; not on the disposition of the accidental excess. *Spaulding v. Lowell*, 23 Pick., 71.

But power conferred on a municipal corporation to construct and maintain a dam, for the purpose of leasing the water power

to private persons for private use, would be, independently of taxation, of questionable validity.   Municipal corporations, " an investing of the people of the place with the local government thereof," as distinguished from "some people of a place united together in respect of a mystery or business into a company" (*Cuddon v. Eastwick*, 1 Salk., 192), are properly political bodies, created for governmental purposes (2 Kent, 275), part of the machinery, as is somewhere well said, by which the sovereignty works.   See the opinions of STOW, C. J., in *State v. Supervisors*, 2 Chand., 247 (2 Pin., 552), and of DIXON, C. J., in *Milwaukee v. Milwaukee*, 12 Wis., 93.   The constitution of the state distinguishes the power to create them from the power to create other corporations (art. XI, secs. 1, 2, 3).   And it would be interesting to consider whether and how far the power of the leigslature to grant franchises to public corporations is restricted to municipal, in the sense of public, purposes only.   See *Bushnell v. Beloit*, 10 Wis., 195 ; *State v. Tappan*, 29 id., 664.   But such consideration is unnecessary here.   For the power to construct and maintain a dam conferred on the city by ch. 333 of 1875 is coupled with, and expressly rests on, the right to borrow money and to tax.

This court, as now organized, has, in submission to the rule *stare decisis*, reluctantly, against its own views, followed *Newcomb v. Smith*, 1 Chand. 71 (2 Pin., 131), in upholding the mill dam act.   *Fisher v. Horicon Co.*, 10 Wis., 351.   But the court has never been disposed to extend the doctrine or authority of that case : probably never will.   *Newell v. Smith*, 15 Wis., 101.   Indeed the authority of that case would hardly aid this. And we cannot hesitate in holding, what was not questioned at the bar, that, if the statute under consideration grant power to the city to construct and maintain the dam, for the purpose of leasing the water power for manufacturing purposes, it is a power for a private and not a public use, and cannot be upheld. *Curtis v. Whipple*, 24 Wis., 350 ; *Whiting v. S. & F. R. R. Co.*, 25 id., 167.

JANUARY TERM, 1875. 437

The Attorney General vs. The City of Eau Claire and others.

And it is equally certain that if the power be alternative and optional, either for a public or for a private use — to construct a dam, to be used, when constructed, either for the purpose of water works, or for the purpose of leasing the water power for manufacturing purposes, in the discretion of the city, — it cannot be upheld. It seems too plain for discussion, that if the legislature grant an equivocal power, subject to the election of the grantee, for either one or other of two purposes, the one lawful and the other unlawful, the power cannot be upheld upon the chance of its being lawfully applied. In such a case the election is inherent in the grant, and cannot be separated from it. The validity or invalidity of the use resting in the subsequent discretion of the grantee, the power cannot be aided by anything *dehors* the grant itself. The discretion is in the statute; and the statute must be construed in the light of the discretion to put the work authorized to an unlawful use. When the purpose of such a statute is double, each purpose must be valid, to sustain the power. The case is not that of a statute valid in part, and void in part. In such a grant as we are considering, the valid and void purposes are inseparable; and the void purpose taints the whole statute. The case is not that of a statute susceptible of two constructions, the one valid and the other void. In such a statute as we are considering, the duplicity is not in construction, but in the power granted. Construction has done its office when it finds the discretion in the grant. And it is impossible to uphold a franchise granted to impose a public burthen, lawful or unlawful at the election of the corporation to which it is granted: to construct and maintain a dam at public expense, to be applied either to a public or a private use, as the city may see fit to determine.

The validity of the power in question, therefore, rests in the proper construction of the statute granting it; turning on the question whether the power to construct the dam is dependent on the construction of water works and incident to it.

And this must appear affirmatively in the statute, to support

the power.    Taxation is the absolute conversion of private property to public use.    And its validity rests on the use.    In legislative grants of the power to municipal corporations, the public use must appear.    *Knowlton v. Rock Co.*, 9 Wis., 410 ; *Soens v. Racine*, 10 id., 271 ; *Lumsden v. Cross*, id., 282 ; *Foster v. Kenosha*, 12 id., 616 ; *Hasbrouck v. Milwaukee*, 13 id., 37 ; *Brodhead v. Milwaukee*, 19 id., 624 ; *Curtis v. Whipple, supra ; Whiting v. R. R. Co., supra ; State v. Tappan, supra.*    The legislature can delegate the power to tax to municipal corporations for public purposes only ; and the validity of the delegation rests on the public purpose.    Were this otherwise, as was said at the bar, municipal taxation might well become municipal plunder.

III.  We owe great deference to the legislative authority. It is our duty to give effect to all its enactments, according to its intention, as far as we have constitutional right and power. And to that end it behooves us, as far as we are able, to place such a construction on statutes as will reconcile them to the constitution ; and to give them effective operation, under the constitution, according to the intention with which they are passed.    It would be a palpable violation of judicial duty and propriety to seek in a statute a construction in conflict with the constitution or with the object of its enactment ; or to admit such a construction, when the statute is fairly susceptible of another in accord with the constitution and the legislative intention.    And it would not only be unbecoming, it would be unwarrantable, as was well suggested by counsel, to impute insidious ambiguity, intent to violate the constitution *per ambages*, to a statute.    We shall surely not look for *intentio cœca mala* in any statute.    We shall hold all statutes framed and passed in good faith.    And it is proper to say that we see in this statute, probably framed for the city and in its interest, no ground for criticism of *mala fides*. . It is possible that it is so inartificially framed as not to express the true legislative intention, though we do not think so.  But it appears to us di-

rect and perspicuous, and we have little difficulty in putting a construction upon it. We shall, as our duty is, construe it fairly and favorably to give it effect, if we can : *ut res magis valeat quam pereat.* But, in doing so, we cannot overlook our duty to the constitution, or enforce a statute which will not fairly bear a construction consistent with the safeguards of that paramount instrument, which binds both legislature and judiciary, and to which their powers and duties and ours are alike subordinate.

Sec. 1 of this statute authorizes the city to construct and maintain a dam across the Chippewa, within the limits of the city ; to construct water works ; to open and construct drains, sewers and mains for the same ; to establish water rents, and provide for their collection.

Sec. 2 requires the city to construct booms and piers in the slack water of the dam, for protecting the navigation of the river and for assorting and storing logs, etc.

Sec. 3 authorizes the city to lease the water power of the dam for manufacturing purposes, except so much as may be needed by the city for hydraulic purposes ; and to lease the piers and booms, and to fix the rates of boomage and storage.

Sec. 4 requires the dam to be constructed with a lock for steamboats and with chutes for logs, lumber, etc.

Secs. 5, 6, 7 and 8 relate to the manner of construction, the navigation of the river, etc.

Secs. 9 and 10 require an election to accept the power; and, in case of acceptance, authorize the issue of bonds by the city in aid of the works, providing for their payment out of the revenues of the works, and for tax to supply deficiencies.

We are not to forget that, though this is the statute of the legislature, it was presumably framed and passed at the instance of the city. "Almost invariably in practice, municipal charters have been granted or altered by our legislature, in accordance with the expressed will of the corporators." GREEN, C. J., in *City of Paterson v. Society, etc.*, 4 Zab., 385.

And we think that there is little room for doubt, on the face of the statute, that its main purpose is the dam, and the piers, booms, etc., incident to it: the water power created by the one, and the commercial facilities accruing from the others. And we see no room for doubt that, the dam once created, its use for water works, and indeed the construction of the water works at all, are left by the terms of the statute wholly in the discretion of the city. The power to construct the dam, and the power to construct water works, appear plainly to be distinct and independent powers, with no words in the statute to connect them. There is nothing to make the construction of water works a condition of the construction of the dam, or to appropriate the constructed dam to water works. The city is not only authorized to construct the dam, without water works, but is also authorized to construct water works, without the dam; and indeed, having built the dam, to establish water works from any other available source, without using the dam or the water supplied by the dam. If water works be constructed, and the power of the dam be necessary or convenient to them, the city may reserve sufficient power from lease. That permission is the only connection of the two in the statute. But the city is not obliged to reserve power for water works, or prohibited from leasing the whole power, at its discretion.

Had water works been the principal object of the statute; had they been intended to be jurisdictional, so to speak, to the dam; had the dam been regarded as an incident to them, nothing would have been easier than the expression of such purpose in the statute, nothing more natural than the indication of such understanding. But there appears to be a studious avoidance of language, phrase or word of such import; which satisfies us of the intention of the statute to leave the city free to use the dam, when constructed, for one purpose or the other; free, in its discretion, to lease all the water power for manufac turing; to establish water works or not; if established, to find water and power for them elsewhere. Everything tending to

embarrass the freedom of discretion of the city, in the use of the dam, is carefully excluded from the statute. This is hardly to be called construction. It is the plain letter and palpable meaning of the statute, strongly confirmed by a critical examination of its provisions in detail.

If the dam were designed as means of supplying the city with water, it is very noticeable, at the outset, that, though the statute assumes to enlarge or renew the power of the city to construct water works, it does not begin in natural and logical order with the principal power, but with the incidental and subordinate power. If the statute looked to water works as the end, and a dam as means only, it would not be likely to begin with the dam, followed by water works and other uses as consequences, not causes, of the dam.

If the intent of the statute were to authorize a dam for water works, then the dam, drains, sewers and mains of the first section would all be equally means to that end. Yet in the terms used, the drains, sewers and mains are dependent, and the dam independent. It is hardly possible to regard this as accidental.

The first section is permissive. The city may build a dam; may build water works. But, if the dam be built, the second and other sections are mandatory in terms. The city must build the works designated for convenient use of the dam. If the dam look to water works for its end and authority, it is not easy to comprehend how the convenient use of the dam should be mandatory, and the jurisdictional use of the dam should be permissive only. The statute appears to distinguish mandatory and permissive provisions, in terms, and to use each intelligently.

The third section authorizes the leasing of all the water power, except so much as may be needed by the city for hydraulic purposes. We agree with the counsel of the city that these hydraulic purposes include water works. But here again it seems unaccountable that, if water works were the object of

the dam, and the power to lease relates only to a contingent overplus, the incident precedes the principal, and the principal figures only as a permissive exception to the incident.

And, finally, we have the pregnant significance of the fact that, the dam once erected, the right to use the power for water works, and the right to lease it for manufacturing, are of equal authority in the statute, both alike permissive in terms.

We can be in no doubt of the true construction of this statute. We cannot hold the power. to build the dam dependent on a public use. And we should be letting the power of taxation run wild, very much at the bidding and discretion of municipal corporations, to sustain such a statute resting on it.

It follows that the defendant, the city, has no authority of law to erect or maintain the dam in question across a public river, or to borrow money or levy tax for the purpose.

IV. It is unnecessary now to consider the question discussed at the bar, whether the proper proceeding to restrain measures looking to taxation in such a case, should be by the attorney general or by the owners of property to be affected by the tax. In either. case, the proper jurisdiction is in the circuit court. The mere fact that the attorney general may maintain such a suit, is not sufficient to authorize this court to entertain it. In ordinary cases, this court will not extend its original jurisdiction to restraint of local, municipal taxation for alleged irregularity or want of authority.

We assent to what was said by counsel for the information, of the nature of municipal corporations, and of their relations to the state, and of the part they play in the administration of the state. Of course every question of municipal taxation is *publici juris*. But it is equally so whether it be raised by a tax payer, or by the municipality, or by the state. It is not enough to put in motion the original jurisdiction of this court, that the question is *publici juris;* it should be a question *quod ad statum reipublicæ pertinet:* one " affecting the sovereignty

of the state, its franchises or prerogatives, or the liberties of its people." *Att'y Gen. v. R. R. Companies*, 35 Wis., 425.

It was repeated in that case, as it had been held in *Att'y Gen. v. Blossom*, 1 Wis., 317, that "this court takes the prerogative writs, for prerogative jurisdiction, with power to put them only to prerogative uses proper." Prerogative writs often go in aid of private right or of local public right. But the original jurisdiction of this court is not only limited to the prerogative writs, but it is confined to prerogative causes. The word properly implies sovereign right. Jacob defines it as "that power, preeminence or privilege which the king hath and claimeth over and beyond other persons, and above the ordinary course of the common law, in right of his crown." And so we find the object of the prerogative jurisdiction of this court declared in *Att'y Gen. v. Blossom:* "Contingencies might arise, wherein the prerogatives and franchises of the state, in its sovereign character, might require the interposition of the highest judicial tribunal to preserve them." And though the question did not arise in the case, it is quite evident from all that has any bearing on it in *Att'y Gen. v. R. R. Companies*, that to bring a case properly within the original jurisdiction of this court, it should involve, in some way, the general interest of the state at large. It is very true that the whole state has an interest in the good administration of every municipality; so it has in the well doing of every citizen. Cases may arise, to apply the words of C. J. STOW, geographically local, politically not local; local in conditions, but directly affecting the state at large. Cases may occur in which the good government of a public corporation, or the proper exercise of the franchise of a private corporation, or the security of an individual, may concern the prerogative of the state. The state lends the aid of its prerogative writs to public and private corporations and to citizens in all proper cases. But it would be straining and distorting the notion of prerogative jurisdiction to apply it to every case of personal, corporate or local right, where a prerogative writ

happens to afford an appropriate remedy. To warrant the assertion of original jurisdiction here, the interest of the state should be primary and proximate, not indirect or remote; peculiar perhaps to some subdivision of the state, but affecting the state at large, in some of its prerogatives; raising a contingency requiring the interposition of this court to preserve the prerogatives and franchises of the state, in its sovereign character; this court judging of the contingency, in each case, for itself. For all else, though raising questions *publici juris*, ordinary remedies and ordinary jurisdictions are adequate. And only when, for some peculiar cause, these are inadequate, will the original jurisdiction of this court be exercised for protection of merely private or merely local rights.

In this view we are called upon for special caution in cases of injunction; because the writ does not indicate the jurisdiction. We hold that we have original jurisdiction by way of injunction, as a *quasi* prerogative and *quasi* original writ. We must see to it that we are not misled in practice into original jurisdiction of the writ in its ordinary use as a judicial writ.

It was with these views that we declared the rule in *Att'y Gen. v. R. R. Companies*, that all cases of original jurisdiction must proceed upon leave, showing *prima facie* " that the case is one of which it is proper for this court to take cognizance." And these were not altogether new views of the jurisdiction, as counsel seem disposed to think. As early as *May v. Keep*, 1 Chand., 285 (2 Pin., 301), approved in *Hurlbut v. Wilcox*, 19 Wis., 419, this court refused a writ of *certiorari*, because the circuit court had jurisdiction. And though the writs in these cases appertained to the appellate jurisdiction of the court, the reason applies equally to writs within the original jurisdiction. In cases of *mandamus*, the court made a rule in 21 Wis., 694, and enforced it in *State v. Haben*, 22 Wis., 101, applying in terms to cases of original jurisdiction, that the writ should not issue here when there is ample remedy in the circuit court. And

there have been several instances since of refusal to issue both writs.

These cases rest indeed upon the concurrent jurisdiction of the circuit court. But the distinction is practically the same. In all cases of purely private or local interest, the jurisdiction of the circuit court is *prima facie* adequate. If it be inadequate in any case, it must generally be so because the interest in litigation is something more than private or local.

We cannot but confess the criticism of counsel that many cases in this court, especially of *quo warranto*, are inconsistent with the rule now declared, and with the doctrine in *Att'y Gen. v. Blossom* and *Atty Gen. v. R. R. Companies.* But the jurisdiction in those cases passed *sub silentio*, without attempt by bar or bench to define it or to limit its exercise. We think it may be hoped in future that there will be more care and accuracy by counsel and court.

It was suggested that we should establish general rules governing our original jurisdiction. That would be too bold an undertaking to venture on. Rules will arise, as cases come here, far more safely and properly than they could be prescribed in advance. We can now only declare the views which influence us in passing upon this motion. It is sufficient here to hold that proceedings to restrain municipal undertakings or municipal taxation, in ordinary cases, belong appropriately to the original jurisdiction of the circuit, and not of this court.

These are questions *publici juris*, as are title to local public office, performance of local official duty, use of local highways, maintenance of local public buildings, abuse of local power or franchise, and kindred local matters. But these are not generally questions directly involving the sovereign prerogative or the interest of the state at large, so as to call for the prerogative jurisdiction of this court. As a rule, no extraordinary jurisdiction is necessary or proper for them; the ordinary jurisdiction of the circuit court being ample. Practically it would be impossible to take jurisdiction of them all here; and we intend to

assume jurisdiction of none of them, which are not taken out of the rule by some exceptional cause.   When they are governed by some peculiarity which brings them within the spirit and object of the original jurisdiction of this court, we will entertain them.   Otherwise they will be left to the circuit courts.  ·And this we understand to be the true spirit and order of the constitutional grant of jurisdiction.

There is nothing to distinguish this case, in this aspect of it, from any other case of local works, involving local taxation, by a municipal corporation; with adequate remedy for all wrong in the circuit courts.   And if the case rested here, we should be compelled to decline jurisdiction.

V. We have already intimated that we are indisposed ·to extend the original jurisdiction of this court to cases of encroachment on local highways.   As STOW, C. J., says, it is difficult, in considering such things, to conceive what is not local in some sense.   But in considering what is or what is not local for the purpose of jurisdiction, we should surely distinguish between a thoroughfare by railroad, of common interest to all, and an alley in some municipality known of few only.   And there may be highways by water, local in this sense.   But navigable waters leading into the Mississippi and St. Lawrence con-stitute a· peculiar class of highways, which cannot be considered local for jurisdiction.   They are not merely highways. They are a trust from the federal government to the state, accepted by the state, which the state is bound to keep as common highways forever free to the people of the state and of the United States.   Ordinance of 1787, art. IV ; Act of Congress, April 20, 1836, sec. 12 ; Act of Congress, August 6, 1846, sec. 3 ; Const., art. IX, sec. 1 ; *Pollard v. Hagan*, 2 Howard, 312 ; *W. R. I. Co. v. Lyons*, 30 Wis., 61.

What are properly local highways, in the sense we have been considering, are generally within the limits of one municipality, existing under its authority, in charge of its officers.   These may generally be left to the protection of local authorities and

local jurisdictions. Public rivers are highways by no local authority; and are rarely, if ever, within a single municipality or in charge of its officers. They are in charge of the state, and the state cannot abdicate its charge of them. That charge is a duty to the federal government, and a trust for the whole people, not of the state only, but of the several states. An unauthorized encroachment upon any of them is a violation of the duty assumed by the state, in its aggregate and sovereign character, to keep them forever open. Every such encroachment is a *pourpresture*, which concerns the sovereign prerogative of the state, and the prerogative jurisdiction of this court. Original jurisdiction of such cases here is too manifest for discussion.

The question does not arise what works the legislature can, under the constitution, authorize in or over navigable waters. Neither does the question whether, under a valid statutory power, providing against material obstruction, an injunction could properly go against the work authorized, upon a mere averment in advance that it would unlawfully obstruct navigation. Because the statute of 1875, in our view, is inoperative either to give any power or to impose any restriction upon the city in relation to the dam in question. In our view of the statute, if the city should proceed with the work, it would dam a public river within the constitutional protection, without any statutory authority or statutory limitation. If the city do not take the power, it is not bound by the conditions of the power. It would act outside of the power, and without power. We must consider the proceeding as if ch. 333 of 1875 had not been passed. And it is impossible not to regard an undertaking to build the dam as an unlawful attempt to obstruct the navigation of the river.

The actual navigation may be little, and the obstruction might be slight. So the affidavits tend to show. But neither the right nor the wrong is a question of degree. We cannot listen to one about to put an unlawful work in a public river, that

it will not materially obstruct navigation. If the obstruction be undertaken, without valid authority, it is our duty, in a proper case, without counting convenience or inconvenience, to interpose the prerogative writ of the state to secure the prerogative right of the state from infringement.

And it is proper to say here that, if the court take jurisdiction of the information on this ground, it will not ignore the other branch of the case, although that was insufficient to give jurisdiction. The general rule is familiar, that a court of equity, when it has taken jurisdiction of a matter for one purpose, will give the remedies proper to it for all purposes.

VI. This motion was argued with ability and learning on both sides, with the understanding that the information contained sufficient averments to charge the city with undertaking to proceed under the statute to construct the dam. Upon examination, we do not find this to be the case. The information pleads an ordinance of the city, providing for an election under the statute; but no other act or purpose on the part of the city or its officers, looking towards the construction of the dam. The time for the election has passed; so that even that averment seems to fail. We are informed by the affidavits that the election was had, and the power of the statute accepted; but even that is not pleaded. *Non constat*, notwithstanding the ordinance and the election, that the city intends to proceed. And so the information appears bare of averments upon which an injunction could properly go. We cannot entertain a cause, or send out a writ, to enjoin a naked claim of power, without apparent purpose to act upon it.

But as this is presumably an oversight which can be cured by formal amendment, and as the motion was so fully discussed on the merits, we deemed it due to the cause to pass upon the questions argued, without subjecting a new motion to a new argument. The attorney general may apply for leave to amend the information and then renew the motion. And if we find the necessary averments to authorize an injunction, we shall,

so far as the questions argued go, grant the motion and issue the writ. But the argument was so satisfactory, and our time is so occupied, that we are not willing to hear the same questions argued upon another motion.

*By the Court.* — Ordered accordingly.